193 N.J. Super. 568 (1983)
475 A.2d 608
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LAWRENCE KRIEGER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 1983.
Decided February 28, 1983.
*569 Before Judges MICHELS, PRESSLER and TRAUTWEIN.
Robert A. Jacobson, Designated Counsel, argued the cause for the appellant (Joseph H. Rodriguez, Public Defender, attorney).
Margaret Ann F. Mullins, Assistant Prosecutor, argued the cause for the respondent (Joseph A. Falcone, Passaic County Prosecutor, attorney).
The opinion of the majority was delivered by PRESSLER, J.A.D.
Defendant Lawrence Krieger, tried to a jury, was convicted of two charges of arson contrary to N.J.S.A. 2C:17-1(b) and was sentenced to concurrent indeterminate terms.
We reverse the convictions, having concluded that the trial judge erred in denying defendant's motion for a judgment of acquittal at the close of the State's case. We are in full agreement with the argument of defendant then made that there was insufficient evidence adduced by the State to warrant a conviction since the only evidence of guilt, direct or circumstantial, *570 was a confession by defendant which lacked independent corroboration adequate to generate a belief in its trustworthiness.
Defendant, then 20 years old, was first employed by Sealy Mattress Company in Paterson as a production foreman on January 2, 1980. He was a Newark high school graduate, resided in Newark, had applied for a position as a Newark fireman and was on a waiting list for appointment thereto. Sealy occupied a three-story manufacturing facility. Located on the second story was a large storage room in which various materials used for the production of mattresses were kept. The room was a large open area, approximately 40 feet by 110 feet in size, which had to be traversed in order to reach a production area on the same floor. It appears that the main sewing area was on the first floor and apparently production activities involving foam rubber were conducted on the third floor. The plant employed about 70 people, all of whom began their work day at 7:00 A.M. Two or three of the employees worked regularly in the storage room and about 25 worked in the second floor production area. Defendant's duties required him to move about all over the plant and took him many times daily through the storage room.
The first of the fires occurred on the morning of January 29, 1980, and the second occurred on the morning of February 12, 1980. On each occasion a bale of material in the storage room had been ignited, the fire and its damage were localized, the fire was quickly brought under control by employees using fire extinguishers, and the Paterson Fire Department responded, completed the fire extinguishing process, and investigated. The investigations of both fires indicated to the fire officials that they were of incendiary origin, that is, set by human agency, although there was no indication of or opinion about the actual manner in which they had been set or, at least as to the first fire, whether it had been accidentally or intentionally set.
*571 Defendant, who was at work on both occasions, was routinely questioned at the plant on February 14, two days after the second fire, by two investigators from the Passaic County Prosecutor's office, Investigators Robert Daniels and Arthur Hyslop. He was given Miranda warnings, was asked about the fires, and denied any knowledge thereof. He also agreed to submit voluntarily to a polygraph test, which was scheduled for February 25. On the scheduled date, defendant appeared at the prosecutor's office and was introduced by Hyslop, on that day in charge of the investigation because of Daniels' absence, to Officer Richard Falcone, the prosecutor's polygraph operator.
Defendant and Falcone were alone together for about an hour. It is undisputed that approximately the first half hour of the session was consumed by preliminary procedures including Falcone's giving of Miranda warnings, his explanation to defendant of the way the polygraph machine worked, and the actual administration of a "control" test. It is further undisputed that at the conclusion of these preliminaries, the polygraph testing was terminated and defendant, at Falcone's encouragement, confessed to setting both fires. What is, however, very much disputed is the nature of Falcone's encouragement, the record supporting to some degree at least, defendant's assertion of psychological coercion.
In any event, after defendant made his admission to Falcone, Falcone took him back to Hyslop for formal interrogation. Falcone first, however, elicited the following written statement from defendant:
 Lawrence Krieger
 61 Brill St. Newark
 12:36 P.M.
 Feb. 25, 1980
I'm really sorry for what happened at Sealy Mattress Company. Im the one who set the fires on Jan. 29 and Feb. 12. I will never do anything like this again, I never did anything like this before and Im ashamed. Everything I have written and said is 100% truth, Im sorry.
 Lawrence Krieger [signed]

*572 I have read the above and it is all the truth. No one have forced me to write this, or made any promises to me. I was treated very fairly by Richard Falcone. I have no complaints about what has happen hear today.
 Lawrence Krieger [signed]
 12:46 P.M.
Hyslop's interrogation of defendant, which was again preceded by Miranda warnings, culminated in defendant's second signed confession. This confession is a four-page document in question and answer form, the entire inculpatory portion of which is as follows:
Q. Knowing and understanding your rights, and knowing you are not under arrest or custody, do you wish to give us a statement about a fire which occurred on January 29, 1980 and a fire that occurred on February 12, 1980?
A. Yes.
Q. Can you tell me in your own words the circumstances leading up to the fire which occurred on January 29, 1980?
A. Well I was under pressure a lot of problems and I was constantly told I was irresponsible. I punched in. I went into the sewing room to see if anything had to be brought up stairs. There wasn't anything at the time. So I walked up stairs went into the store room and I had a cigarette and I was playing with a book of matches. I dropped them on the floor then the fire started. And I grabbed the fire extinguisher to put it out. No harm intended. Then other people grabbed fire extinguishers until the fire dept. arrived, then I went downstairs to help cover the machines and the materials so they wouldn't be damaged. Then we cleaned up and work went on as usual.
Q. What kind of pressure are you under?
A. Many family problems, non-understanding of the things I do, Lack of my ability and responsibility.
Q. On January 29, 1980, what time did you punch in to work?
A. About five to seven. (a.m.)
Q. How soon after punching in did you go to the store room?
A. Twenty minutes.
Q. Approximately what time did you set the fire?
A. 7:30 a.m.
Q. You stated previously, that you were playing with a book of matches. Why?
A. I dropped them on the floor to start the paper on fire to burn the matts.
Q. In what part of the store room did you set the fire?
A. The middle.

*573 Q. Did you know before you got to work that you were going to start a fire?
A. Not really. It was on my mind.
Q. When did you first plan to start the fire and why?
A. The day before it happened, did it for recognition and a form of responsibility cause I put the fire out before it spread to any great deal of damage. No harm was intended.
Q. Do you want a cup of coffee or something to drink at this time or go to the men's room.
A. Just a cigarette. (At this time, Inv. Hyslop gave him a cigarette).
Q. When you planned the fire, did you also plan to put it out?
A. Yes, immediately.
Q. Previously, you stated that you wanted to receive recognition. Why?
A. I felt as if no body knew I was there. And I was just running around doing things that no one really appreciated.
Q. From whom do you want to get this recognition?
A. Any superior.
Q. Did you feel by starting the fire and subsequently extinguishing the fire that you would gain this recognition?
A. I don't know but I was hoping to.
Q. At this time would you like to add anything else regarding the fire on January 29, 1980?
A. Only that there was absolutely no harm to any one or anything except the mats.
Q. Again can you tell me in your own words the circumstances which were involved regarding the fire at Sealy Mattress Co. on February 12, 1980?
A. I punched in. I went to the sewing room to see if anything was to be brought upstairs. I brought a cart of materials up on the elevator. I talked to Wyatt. I proceeded to walk down stairs. Still with family problems, and work problems regarding my responsibility I lit a cigarette, put a book of matches on an inside ledge, placing the cigarette down on the same ledge, I walked to the third floor. I thought I heard someone coming from upstairs. I spoke to Willie and came immediately downstairs to extinguish the fire. Again with no harm intended.
Q. Why did you start this second fire on February 12, 1980?
A. Hoping for possible recognition of the company and home.
Q. At approximately what time did you set this fire?
A. About 8:00 a.m.
Q. In what room did you place the cigarette and matches on the ledge?
A. It was in the store room where the mats are kept.
Q. Did anyone besides yourself have anything to do with setting the fire on January 29, 1980 or February 12, 1980?
A. No.

*574 Q. Did you discuss this with anyone before you set the fires?
A. No.
Q. When did you start working at Sealy Mattress Co.?
A. January, I don't know if it was the second or third. I think it was the second, 1980.
Q. Did you ever set any other fires either at Sealy Mattress Co. or anywhere else?
A. Never.
Q. On February 12, 1980 did you know before you got to work that you were going to start a fire?
A. Yes.
Q. When did you first plan to start the fire?
A. The night before and that morning. Again, with no harm intended.
Q. Previously in your statement, you state that you spoke to Willie. Who is Willie?
A. He's in charge of foam rubber at Sealy.
Q. Why did you put a lit cigarette and a book of matches on the ledge in the store room?
A. To start a small fire.
Q. How would this start the fire?
A. The cigarette would start the book of matches on fire, causing a bundle of mats to catch.
Q. Is there anything that you would like to add regarding the fire on February 12, 1980?
A. I just want it to be understood that there was no harm intended or a great deal of damages to occur.
The trial commenced with a Miranda hearing at which Hyslop, Falcone and defendant testified. Defendant denied the truth of the admission, explaining that his confession was produced by Falcone's interrogative techniques which overrode his will and induced him to accept Falcone's suggestions of guilt and motive. The trial judge nevertheless found the confession to be voluntary and hence admissible. The trial proper then proceeded.
It is perfectly clear and the State does not argue to the contrary that the confession constituted the only proof of defendant's guilt. In this posture it is also clear that if the confession was insufficiently corroborated, he was entitled to a judgment of acquittal. The applicable principle of law in this *575 jurisdiction was settled by State v. Lucas, 30 N.J. 37, 56 (1959), in which the Supreme Court opted for the rule that where a confession is offered for the truth of its contents, "the State must introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury * * *." Thus, concluded the Court in Lucas,
On motion to direct an acquittal on grounds of lack of corroboration the trial court must determine whether there is any legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy. Id. at 62.
See also State v. Ordog, 45 N.J. 347, 365 (1965), cert. den. 384 U.S. 1022, 86 S.Ct. 1942, 16 L.Ed.2d 1025 (1966); State v. Fauntleroy, 36 N.J. 379, 399 (1962); State v. Johnson, 31 N.J. 489, 502-503 (1960).
The corroboration rule is, of course, predicated on the assumption that a confession, albeit voluntary, is not necessarily true. The purpose of the rule, therefore, as cogently and succinctly explained by the Supreme Court is "to avoid the danger of convicting a defendant solely out of his own mouth of a crime that never occurred or a crime committed by someone else." State v. Johnson, op. cit., supra. That danger, of course, exists wholly apart from the question of the voluntariness of the confession. Hence in our view, the post-Lucas development of the constitutional predicates of Miranda warnings is entirely irrelevant to the corroboration issue. Meticulous attention by law enforcement officials to a defendant's Miranda rights may well result in foreclosure of his practical opportunity to challenge the voluntariness of the ensuing confession but it does not substitute for or replace the necessity for corroboration aliunde of the confession.
In the light of these principles, we are constrained to conclude not only that the confession here was inadequately corroborated to meet the trustworthiness standard, but also that its details were both so sparse and so contradicted by the *576 State's undisputed evidence as to generate an affirmative belief in its untrustworthiness.
It was proved by the State that defendant, together with 70 other employees, was on the premises when the fire occurred. Corroboration of the confession virtually ends with that fact.
Addressing first the facts recited in the confession respecting the first fire, we note at the outset that defendant did not and was not asked to identify the specific material which was ignited beyond the statement that "matts" were burned. The bulk of the material in the storeroom consisted of mats or pads of one sort or another, and apparently on both occasions the fire fighters removed the bales of burnt mats to an outdoor yard where they were in full view of all employees. Surely, had defendant actually ignited the bale of material he would have known what they were because his duties required him to deliver designated materials on a written list to various production areas. The material which was ignited the second time was a stack of hog-hair and horse-hair pads, entirely different materials than were burned the first time and which, because of their composition, gave off a peculiarly rancid odor. Defendant was never asked to give any identification of the kind of materials burned in the second fire although, as noted, he surely would have known what they were.
Even more troublesome to us than the lack of identification of the burned materials is the information regarding their location. When asked during his interrogation to state the part of the storeroom in which the first fire was set, defendant's answer was "the middle." Yet, according to the testimony of the plant manager, the burnt cortex pad bales had been piled against the wall and "about ten feet from the wall there seemed to have been the hottest part of the fire." As to the second fire, the confession relates only that defendant placed a lit cigarette on an inside ledge of the storeroom next to a book of matches. There was no proof at trial, however, of the fact that there was a ledge in the storeroom at all, or if there was, *577 where in relation to the ledge the hair pads were located. Thus, there was absolutely no proof that the briefly described modus operandi could have started that fire.
There are problems as well with defendant's confession statement explaining the manner in which the fires were set. As to the second fire, we are satisfied that without defendant having demonstrated how he placed the lit cigarette and the book of matches in relation to each other, it is not even evident that the burning of the cigarette would necessarily have ignited the book of matches or that, if it had, the burning matchbook would have fallen off the ledge, resulting in the ignition of the pads. Of further significance in respect of modus operandi is the fact that in his initial admission to Falcone defendant claimed to have set the first fire by tossing a lighted cigarette onto the bale. He gave the further matchbook explanation only after Falcone had informed him that a lit cigarette alone could not have caused the blaze.
Perhaps, however, the most troublesome aspect of the confession relates to defendant's statements regarding the timing of the second fire. Defendant explained that he "punched in," went to the first floor sewing room to see if materials had to be brought upstairs, and then took a cart of materials from the first floor to the second floor by elevator. Presumably he delivered this cart to Wyatt, who was an employee working on the second floor production area. After engaging in a conversation with Wyatt, he walked back downstairs, brooding about his personal problems. Of necessity, although he did not say so, he then walked back to the second floor where he finally placed his incendiary material on the ledge. Then he walked up to the third floor where he engaged in conversation with Willie, the foam rubber worker. The fire then started and he rushed downstairs to extinguish it. It was his further statement that he had set that fire at about 8:00 A.M. The State's proofs, however, showed that on the day of the second fire, defendant "punched in" his time card at 6:53 A.M. and the fire department received the alarm at 7:03 A.M. That would leave a period of *578 10 minutes in which defendant performed all the described traversals by stairs and elevator, picked up and delivered a cart of material, conversed with two separate co-employees, and arranged the cigarette and matchbook device. Also, during those ten minutes, the cigarette would have had to have burned down sufficiently to ignite the matchbook, the matchbook would have had to ignite the pads, and the burning of the pads would have had to have progressed sufficiently to start the sprinkler system which triggered the alarm to the fire station. Not only is that scenario in our view inherently and prima facie unlikely, but there was absolutely nothing adduced by the State to corroborate any of defendant's movements or the time normally consumed thereby or his alleged conversations with either of the co-employees, since neither Wyatt nor Willie testified. Indeed, there wasn't even any corroboration of defendant's statement that he had been the one or at least one of the several employees who had first attacked the fires with fire extinguishers.
Finally, there was no corroboration of the alleged motive. Although the plant manager, on the State's direct examination, suggested that defendant's attendance record was not satisfactory, he did admit on cross-examination that at least as of the time of the fires, he was not personally familiar with defendant's work record since the evaluation normally made following a probationary employment still had not taken place. No other plant supervisor or co-employee testified.
The judicial decisions of this State, including Lucas and those decisions heretofore cited following Lucas, all placed great emphasis on the wealth of the independently corroborated detail included in the confession being considered and on the fact that significant details therein stated could have been known only to a participant in the crime. See also State in Interest of B.D., 110 N.J. Super. 585 (App.Div. 1969), aff'd o.b. 56 N.J. 325 (1970). This confession on the other hand is characterized by a singular paucity of detail, the disclosure of *579 no special or "inside" information regarding the crime or its circumstances, virtually no corroboration of the minimal detail which is set forth, and, most importantly, critical contradictions of undisputed facts. A confession by itself, voluntary or not, cannot take the place of adequate police investigation and the presentation of adequate trial proofs. That is the policy of the corroboration rule, and that policy, in our view, was abrogated here. In sum, there was no demonstration by independent proof of the trustworthiness of the confession. Defendant was, therefore, entitled to the judgment of acquittal for which he moved.
We note that defendant raises other challenges to the conviction, including the ruling on voluntariness of the confession, the prosecutor's cross-examination of defendant regarding his refusal to request a subsequent completion of the polygraph test, and the alleged excessiveness of sentence. We are satisfied that these issues are clearly without merit. R. 2:11-3(e)(2).
The judgment of conviction is reversed and the matter remanded for entry of a judgment of acquittal.
MICHELS, P.J.A.D., dissenting.
I respectfully disagree with my colleagues' holding that the trial court erred in denying defendant's motion for a judgment of acquittal at the close of the State's case because "the only evidence of guilt, direct or circumstantial, was a confession by defendant which lacked independent corroboration adequate to generate a belief in its trustworthiness." The test on a motion for judgment of acquittal on grounds of lack of corroboration is, as clearly stated by the majority, "whether there is any legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy." State v. Lucas, 30 N.J. 37, 62 (1959). I am convinced from a study of the trial transcripts that the State's proofs were sufficiently corroborative to present a question for the jury as to the trustworthiness of defendant's *580 confession, and therefore that the denial of defendant's motion for a judgment of acquittal at the conclusion of the State's proofs was warranted.
The well established rule in New Jersey concerning the quantum of proof independent of the confession that the State must introduce before a confession may be considered evidentiary is stated in State v. Lucas, supra, 30 N.J. at 56, to be that:
[T]he State must introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury. [30 N.J. at 56].
Accord, State v. Ordog, 45 N.J. 347, 363 (1965), cert. den. 384 U.S. 1022, 86 S.Ct. 1942, 16 L.Ed.2d 1025 (1966); State v. Johnson, 31 N.J. 489, 502 (1960); State v. Guild, 10 N.J.L. 163, 185-187 (Sup.Ct. 1828). The reason for this rule "is to avoid the danger of convicting a defendant solely out of his own mouth of a crime that never occurred or a crime committed by someone else." State v. Johnson, supra, 31 N.J. at 502-503.
Here, the State proved beyond a reasonable doubt that two fires were purposely set on the second floor of the Sealy Mattress Company in Paterson, New Jersey. Defendant admitted setting both of them. In his confession, defendant stated that he set the first fire at approximately 7:30 a.m. on January 29, 1980, and the second at approximately 8:00 a.m. on February 12, 1980. He described where he set each fire, how he set each fire, and, very generally, what was burned in each fire. He also described the efforts he made to extinguish both fires almost immediately after setting them by using fire extinguishers and the limited amount of damage caused by each fire.
The independent proofs presented in the State's case established that the defendant was on the premises at the time each fire was set. The company time cards for January 29, the date of the first fire, show that defendant punched in for work at 6:58 a.m. The Paterson Fire Department's records show that its fire alarm office was notified of the first fire at 8:06 a.m. With respect to the second fire, the time cards for February 12 *581 showed that defendant punched in at 6:53 a.m. and the fire department records established that the alarm came in at 7:03 a.m. Furthermore, Harold Naiman, the plant manager, testified that the fires occurred in a second-floor storeroom that was an area of the plant that defendant would have gone through perhaps 15 or 20 times a day to carry out his usual duties. Thus, the State's proofs placed defendant in the building at the time of each fire and established that the fires were set in an area of the plant in which defendant would periodically perform his duties.
Defendant also stated that he set the first fire by dropping a book of lighted matches on the floor "to start the paper on fire to burn the mats," and that he set the fire in the middle of the second-floor storeroom. The description of the materials ignited in this fire was corroborated by Naiman, who testified that bales of cortex pads, which are an insulation material made out of coconut fiber, were involved in the first fire and that the hottest part of this fire was approximately 10 feet from the wall of the building. William Shortway, the Acting Supervisor of the Combustible Bureau of the Paterson Fire Department, confirmed that the fire started on the second floor, damaging coconut fiber bales. Additionally, Shortway testified that he was able to ignite the material with a lighted match and that the fire was caused "by human hand."
With respect to the second fire, defendant stated that he started this fire by placing a lighted cigarette and a book of matches on an inside ledge of the second-floor storeroom in which the mats were kept. According to defendant, the cigarette would start the book of matches on fire, in turn causing a bundle of mats to catch fire. The State's proofs showed that the second fire was on the second floor in an area different from that of the first fire. The materials that were ignited were flat packs containing 15 to 25 pads of hog and horse hair, which were used in the construction of the mattresses. Captain Vittorio Diddio of the Paterson Fire Department, who investigated the second fire, corroborated the location of the fire and *582 tested these pads, finding that they ignited, burst into flames, and burned quite rapidly when exposed to the open flame of a match. Captain Diddio was of the opinion that "the fire was intentionally set by human, by a human being."
Moreover, defendant stated that with respect to the first fire he "grabbed the fire extinguisher to put it out" and that "other people grabbed fire extinguishers until the fire department arrived." The State's proofs corroborated the fact that fire extinguishers were used by employees to extinguish the fire. Defendant's statements concerning the cleanup procedures and the limited extent of damage from the first fire were corroborated by the State's proofs, and defendant's statement that there was absolutely no harm to anyone or anything except the mats was corroborated by Naiman's testimony. Finally, defendant's statement that he set both fires in hope of gaining the recognition of his company was corroborated to some extent by Naiman's testimony on direct examination that defendant's "attendance record was not that great," and that he (Naiman) believed that defendant's "job was in jeopardy at that time."
In my view there was more than sufficient corroborative evidence to establish that defendant was telling the truth when he confessed to setting both fires. The failure of defendant to describe with specificity the composition of the materials involved in each fire, or to refer to the rancid odor of the burning hair emitted during the second fire, or to demonstrate how he placed the lighted cigarette and book of matches on the ledge to set the second fire, considered in the light of the totality of the facts and circumstances, does not compel the conclusion that the State failed to satisfy the trustworthiness test laid down in State v. Lucas, supra. Similarly, although perhaps an argument can be made that a discrepancy exists between defendant's statement that he set the first fire in the middle of the second-floor storeroom and Naiman's testimony that the hottest point of this fire was 10 feet from the wall, and although perhaps one could speculate whether defendant could have accomplished everything he said he did between the time he *583 punched in for work on the morning of February 12 and the time that the alarm for the second fire was received by the fire department, such arguments and speculations do not undercut as a matter of law the truthfulness of defendant's confession. They simply raise issues of fact as to corroboration of the confession, which are properly to be resolved by the jury. In concluding that the trial court properly submitted this case to the jury, I am mindful of the Supreme Court's admonition in State v. Lucas, supra, and deem it worthy of being repeated:
Confessions, like other admissions against interest, stand high in the probative hierarchy of proof. It is for this reason that the law imposes various safeguards designed to assure that the confession is true. But safeguards for the accused should not be turned into obstacles whereby the guilty can escape just punishment. [30 N.J. at 57-58]. (Emphasis added).
Accordingly, I would affirm defendant's convictions and the sentences imposed thereon.