571 A.2d 914
STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ANTHONY DI FRISCO, DEFENDANT–APPELLANT.

Argued May 9, 1989—Decided March 12, 1990.

254

*George T. Taite* argued the cause for appellant (*Samuel R. De Luca,* attorney; *Samuel R. De Luca* and *George T. Taite,* on the brief).

*Hilary L. Brunell,* Assistant Prosecutor, argued the cause for respondent (*Herbert H. Tate, Jr.,* Essex County Prosecutor, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause on behalf of *amicus curiae,* Attorney General of New Jersey (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

In this capital-murder case, a hit-man has been sentenced to death on the basis of his confession that he was hired to kill a pizza-shop owner in order to silence the owner from informing on the higher-up. Killing for hire and killing to avoid detection

are two of the statutory aggravating factors that make a murder death-eligible. *N.J.S.A.* 2C:11–3c(4)(d) and (f).

The murder was a cold-blooded, execution-style killing. Defendant has confessed that he fired four bullets at close range into the head of Edward Potcher, the owner of Jack's Pizzeria, at his Maplewood store on August 12, 1986. He fired a fifth bullet into the victim's body. DiFrisco has confessed that a man named Anthony Franciotti paid him $2500 to kill Mr. Potcher. In these circumstances, if proven, the two murderers fit Senator Russo's description of those for whom the death penalty was designed. His understanding, as the bill's chief sponsor, was that when such aggravating factors are found there are two classes of murderers who were exposed to the death penalty:

> [(1)] the actual perpetrator of the murder, the one who wields the gun or the knife ... that results in the death ... [and (2)] the one who hires one to commit murder * * *.
>
> [*State v. Gerald,* 113 *N.J.* 40, 93–94, 549 *A.2d* 792 (1988) (quoting *Capital Punishment Act: Hearings on S. 112 before the Senate Judiciary Committee* at 2 (1982)).]

The central issue argued in the case by the defendant was the disproportionality of sentencing the gunman to death without even so much as seeking an indictment of the higher-up. *Cf. State v. Marshall, appeal pending* (No. A–3–89) (plea bargain offered to one of killers; husband of victim, who hired killers, was sentenced to death); *State v. Engel,* 99 *N.J.* 453, 493 *A.2d* 1217 (1985) (plea bargain offered to the killer; husband and brother of husband charged with capital murder of victim-wife). Underlying the argument is the belief that the State must have evidence in its file exculpating Franciotti of the connection with defendant; otherwise why not present Franciotti's case to a grand jury?

One thing is clear about this case: defendant was almost certainly involved in the murder of the pizza-shop owner. No one on the outside could have supplied the police with the details that he furnished. Less certain is the role of Franciotti.

■ On April 1, 1987, defendant was arrested in New York on routine street crimes, car theft and reckless endangerment. Apparently defendant thought at the time of the arrest that he would remain free if he implicated someone higher up in the murder. He tried to bargain by turning someone over to the New York City police. He claims that the New York police told him that they would go easy on someone who turns in the one who hires a killer. As Bronx Detective Kukk recounted it:

> And he asked me, he said, "Harry, who is more guilty, a guy who shoots a guy or a guy who pays him to shoot the guy?"
>
> I said, "I have no problem. A guy who pays him to shoot the guy."
> He said, "Are you serious?"
> I said, "Sure."
> "The guy who killed the guy is only an intermediate, only a pawn."
> He said, "Harry, I don't know whether to trust you or not. If I tell you something, you are not going to ram it down me."

The defendant's confession of murder followed.

■ We find no error in the trial court's ruling that the general statement by the New York City police officer did not taint the confession. The statement was not false, so far as it went. It may have been disingenuous, but it surely was not conduct that would invalidate the confession. The fact that an investigative officer is friendly, sympathetic, and encourages the trust of the defendant to give a statement ordinarily would not render the confession involuntary. *See Miller v. Fenton*, 796 *F.*2d 598, 605 (3d Cir.), *cert. denied*, 479 *U.S.* 989, 107 *S.Ct.* 585, 93 *L.Ed.*2d 587 (1986). Rather, the inquiry must be whether an investigator's "statements were so manipulative or coercive that they deprived [defendant] of his ability to make an unconstrained, autonomous decision to confess." *Ibid.*

Evaluation of "the totality of all the surrounding circumstances," *Schneckloth v. Bustamonte*, 412 *U.S.* 218, 226, 93 *S.Ct.* 2041, 2047, 36 *L.Ed.*2d 854, 862 (1973), to determine the voluntariness of the confession indicates that the police officer's remarks did not overbear defendant's will. There was no indication that DiFrisco did not understand his circumstances because of a lack of education, that he suffered due to the

duration or nature of the questioning, or that he was deprived of such comforts as food or sleep. *See id.* at 226, 93 *S.Ct.* at 2047, 36 *L.Ed.*2d at 862. Although the detective was seeking information, he did not believe his remarks would evoke a confession to capital murder, a result far beyond anyone's contemplation. *See Bram v. United States,* 168 *U.S.* 532, 562–63, 18 *S.Ct.* 183, 194, 42 *L.Ed.* 568, 580 (1897) (encouragement that an accused might obtain a mitigation of the punishment for a crime by confessing serves as part of totality of circumstances to taint a confession).

At first incredulous of the defendant's story, the New York police officer asked defendant for details. Defendant did not know where the crime had taken place, nor even the name of the victim. He did know that it involved a pizzeria in New Jersey. He said that Franciotti had paid him to do the killing because the pizza-shop owner was about to inform on Franciotti. He said that Franciotti drove him there on the day of the murder. DiFrisco stated that he entered the pizzeria alone and Franciotti waited in the car while the crime took place.

Bit by bit, the New York police closed in on the case. They called New Jersey authorities. They found an unsolved murder in Maplewood, Essex County, fitting the description of the murder in respect of time and place. The last links were the details furnished by the defendant that there were five shots from a .32 caliber automatic gun, that a silencer was used, and that the store sold only whole pizza pies, not slices.

Within hours, the Maplewood Police and Essex County homicide officers arrived at the precinct house in the Bronx. Defendant repeated the story to them and signed a confession to the murder implicating Franciotti. Several days later, while in police custody in New Jersey, defendant was to call Franciotti to link him to the murder. The police intended to tape that conversation. Defendant had consulted with a public defender, who advised him to make the call. At the last moment, defendant refused to call Franciotti. He said that his father coun-

seled against further cooperation with the police without the advice of paid counsel.

Consequently, an Essex County Grand Jury indicted DiFrisco alone for the murder of Edward Potcher. The charge was capital murder. The aggravating factors noted were that "[t]he murder was outrageously or wantonly vile," *N.J.S.A.* 2C:11–3c(4)(c); that the defendant was paid to commit the murder, *N.J.S.A.* 2C:11–3c(4)(d); and that the murder was committed to escape the detection of another crime, *N.J.S.A.* 2C:11–3c(4)(f).

DiFrisco's case was called for trial on January 11, 1988. He pled guilty to murder, repeating to the court the essence of his confession. He was specifically asked, "And was it your intention to kill him at that time?" And his answer was "Yes."

Pursuant to *N.J.S.A.* 2C:11–3c(1), DiFrisco waived a jury for the penalty phase of his trial. The State sought to prove the three aggravating factors through his confession and the forensic evidence found at the scene. At trial, defense counsel claimed surprise to learn that the case against Franciotti was still "under investigation." He claimed injustice in permitting his client to die without the State even so much as concluding its investigation of the higher-up's case.

The trial court found that two aggravating factors had been proven: that defendant was a hired killer, *N.J.S.A.* 2C:11–3c(4)(d), and one who killed to avoid the detection of another, *N.J.S.A.* 2C:11–3c(4)(f). Although the court made no specific finding, it ruled that the c(4)c factor "was encompassed in the commission of the murder for a consideration." The trial court also found one mitigating factor, that "[t]he defendant rendered substantial assistance to the state in the prosecution of another person for the crime of murder [*N.J.S.A.* 2C:11–3c(5)(g) ]." It found that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. The trial court sentenced the defendant to death. The trial court later denied defendant's motion for a new trial. The defendant

claimed a denial of discovery based on the fact that an investigation into Franciotti was continuing. He learned at the trial that the investigation was continuing. He appealed to us as of right under *Rule* 2:2–1.

## I

■ Defendant claims a *Brady* violation. Under *Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963), a prosecutor has a nondelegable responsibility to furnish the defendant with all exculpatory information that the prosecution possesses. But there is no *Brady* violation here. *Brady* presented the opposite side of the coin. Brady was told that his confederate had given a statement naming Brady as the killer in the robbery. Brady denied this role. Despite his protestations, Brady was convicted of the murder. When the State prosecuted the confederate in a later trial, it used another statement by him in which he did not blame Brady but admitted to the murder. This admission would have sustained Brady's defense theory. According to the Court, the prosecutor had a duty to furnish the exculpatory evidence to Brady. 373 *U.S.* at 87–88, 83 *S.Ct.* at 1196–97, 10 *L.Ed.*2d at 218–19.

Our case is different. The putative exculpatory evidence in this case does not sustain DiFrisco's version of the facts. But more significantly, the file appears to be a blank sheet with nothing to confirm or dispute the State's case or provide exculpatory evidence for the defendant.

## II

### A.

But does this state of the record create, as defendant argues, an unjust disproportionality that invalidates his death sentence? Perhaps the most telling summary of the defendant's argument is found in the remarks of the trial court prior to pronouncement of sentence:

As the Court has already indicated, this Court is perplexed by reason of the Prosecution's failure to move an indictment against Tony Franciotti, who the defendant names as the person who paid him to kill Edward Potcher because, according to the defendant, Potcher was about to "rat" on Franciotti and his associates. The testimony elicited from the State's witnesses with respect to an explanation of the failure to proceed against Franciotti is that calls to a New York City Assistant District Attorney and others did not disclose that Franciotti was a member of organized crime. I am not mindful that the law applies only to members of organized crime. And, further, that beside the defendant's statement, that the State had no evidence to link the defendant with Franciotti except for the fact that Franciotti and the defendant had known each other in jail.

With the exception of the foregoing, the record is totally bare of any reasons why the Franciotti investigation was not concluded or pursued or [why he] was not indicted. On the day of his arrest, Anthony DiFrisco, the defendant, informed both New York Detective Kukk and Detective Sergeant Saunders of Maplewood in detail concerning his role and that of Franciotti in the death of Potcher. He described Franciotti. He provided his address. He related when and where he had been paid as well as how Franciotti had transported him to and from the scene of the crime. And the State does have in its possession at least circumstantial evidence to corroborate that Franciotti and the defendant were well known to each other.

Apparently, upon the retention of and prior to speaking to private counsel the defendant, upon the advice of his father, ceased his cooperation until such time, he stated, as he should have had an opportunity to speak to counsel or to the counsel that his father had retained to represent him. Since that time the State had not requested nor has the defendant further offered any further cooperation. The State's witnesses, Detective Kukk and Detective Saunders and Investigator Kennedy, all offered the opinion that the defendant's confession was a truthful one. It is noteworthy that until the defendant voluntarily related his participation and that of Mr. Franciotti in the crime, that no one had the slightest idea or even a scintilla of evidence of any culpability on their part.

At the penalty-phase hearing, an assistant prosecutor described defendant's partial cooperation with the State's investigation of Anthony Franciotti and testified that Franciotti was still a possible subject of an indictment. He also testified that attempts had been made, independent of the defendant's confession, to substantiate the role that Franciotti had played in the murder. That investigation established a connection between the defendant and Franciotti, but the testimony did not refer to other elements of defendant's story—for example, the fact that the car in which defendant and Franciotti had driven to New Jersey was rented. Of preeminent importance, how-

ever, was defendant's refusal to make the phone call to Franciotti that might have produced an admission of Franciotti's involvement. The prosecutor said:

Q. And do you wish to use the cooperation of Mr. DiFrisco?

A. At this point, sir, I don't believe it would be fruitful at all.

Q. Because he did not make the phone call.

A. He did not cooperate.

Q. Listen to me carefully, sir. You say he did not cooperate. He did not make the phone call. Isn't that true?

A. Correct.

Q. And as a result of not making the phone call, sir, you are saying that that is the end of the cooperation in this case?

A. He would not make the phone call, nor would he testify before a Grand Jury or testify at trial. He said he did not want to cooperate.

Q. When did you invite him to go to the Grand Jury, sir? I have been his attorney since the indictment. When did you invite him to do that?

A. When he said he did not want to cooperate and he said to take him back, sir, that was the end of it. He made the decision, not I.

Defense counsel renewed the inquiry:

Q. Now I ask you, sir, is it your understanding that, as far as Mr. Franciotti is concerned, that even if right now Mr. DiFrisco cooperates and goes to the Grand Jury and testifies, that that would be a fruitless attempt by your office to indict Mr. Franciotti?

A. I am not going to speculate, sir.

Q. So there is always the possibility. Is that correct?

A. I am not going to speculate.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. * * * Don't you believe that [the confession and the jailhouse link] is substantial evidence?

A. Not in this situation. It is enough to get an indictment perhaps, sir, but I don't think it is enough to prove it to a jury beyond a reasonable doubt.

Q. So what you are saying is that you are making a judgment with respect to what a Petit Jury may do. Isn't that true?

A. Not only I, sir.

Q. Whoever made the judgment. Somebody made a judgment. Correct?

A. Correct.

Q. You said that you have enough to get an indictment, but you are not sure whether you can get a conviction. True? You said that a little while ago.

A. There would not have been enough to get an indictment on the hearsay statement of Mr. DiFrisco.

Q. Is it your obligation to present a case to the Grand Jury and if there is an indictment, sir, there is an indictment? Isn't that true?

A. The obligation is to see that justice is done, sir. To get an indictment that cannot be proved is not seeking justice.

Q. When you say [an indictment against Franciotti] cannot be proved, sir, you are now [stating] your judgment with respect to what 12 men may do. Isn't that true?

A. No, sir. Mr. DiFrisco did not want to testify.

This exchange suggests that the State's assessment of its case against Franciotti was based on the understanding that defendant would not testify against Franciotti.

The question of defendant's willingness to testify arose when defense counsel questioned whether defendant had refused to cooperate. The following ensued:

[PROSECUTOR]: He said he did not want to cooperate.

Q. When did you invite him to go to the Grand Jury, sir? I have been his attorney since the indictment. When did you invite him to do that?

A. When he said he did not want to cooperate and he said to take him back, sir, that was the end of it. He made the decision, not I.

Q. Are you aware of my conversation with this Prosecutor before Christmas?

MR. BOGDANSKI: Objection, Judge.

MR. DeLUCA: Judge, this is—

MR. BOGDANSKI: Counsel is now making himself a witness.

MR. DeLUCA: Judge, if I have to, then I will. I mean I think the Court should know that that offer was made, Judge, in light of this statement. I had no problem before. But in light of this.

MR. BOGDANSKI: In light of what, Your Honor?

MR. DeLUCA: In light of this now new testimony.

THE COURT: What Mr. DeLuca is saying, and, of course, that's a problem—I realize the kind of hearing we are involved in. I also realize what the rules provide. You cannot back a witness in the case. You can ask him if he is aware that an offer was made. You can ask the witness that.

Are you aware that an offer was made?

THE WITNESS: I believe it was sometime around the holidays, Judge.

THE COURT: All right.

Apparently, the "offer" under discussion concerned defendant's willingness to testify against Franciotti. Defense counsel renewed the effort to demonstrate his client's willingness to testify against Franciotti:

DEFENSE COUNSEL: When you say [an indictment against Franciotti] cannot be proved, sir, you are now [stating] your judgment with respect to what 12 men may do. Isn't that true?

A. No sir. Mr. DiFrisco did not want to testify.

Q. I am telling you now, sir, that he testified and he is willing to testify.

MR. BOGDANSKI: Objection. Counsel is testifying, Your Honor. We have rules.

MR. DeLUCA: I will withdraw that, Judge.

Q. Sir, this man has pled guilty to a murder. When this hearing is over he will be sentenced. After he is sentenced you still have the statement that you read to the Grand Jury and you now have the body of the man subject to subpoena and also telling this Judge that he was never asked after that to cooperate and he will testify. You are not going to get an indictment?

A. I am not going to speculate, sir.

It thus appears from this representation of counsel that defendant was willing to testify against Franciotti and that his willingness to testify was made known to the State at least some weeks before his trial and again during the penalty phase.

Defendant contended before us that the State's handling of the Franciotti investigation required a reversal of defendant's conviction. The State explained its reasons for not indicting Franciotti. After recounting the events leading to defendant's arrest in New York and extradition to New Jersey, the State's brief gives the following account of defendant's refusal to cooperate:

[Defendant] agreed to contact Franciotti by telephone on the following Friday and the State made arrangements to tape the conversation. However, the call was not made on Friday because the defendant did not want to talk to Franciotti at his place of employment. He indicated that he preferred to contact Franciotti at home on Saturday. On Saturday morning defendant again refused to make the call. He indicated that he had spoken to his father who had advised him not to cooperate or to talk to the police. An Essex County Assistant prosecutor advised the defendant that it was his "last chance" to cooperate. The assistant prosecutor explained,

It would shortly become known that Mr. DiFrisco was in fact charged with this homicide. Once Mr. Franciotti or anyone else involved in the homicide became aware that Mr. DiFrisco was arrested, then certainly they would not engage Mr. DiFrisco in any conversation about the homicide.

The brief reiterates the prosecutor's assertion during the penalty phase that "the State did not have sufficient evidence to prove a case against Anthony Franciotti," and in a footnote argues:

The sole evidence against Franciotti was the defendant's confession. Under *Bruton v. United States*, 391 *U.S.* 123 [88 *S.Ct.* 1620, 20 *L.Ed.*2d 476] (1968), the confession would have been inadmissible at Franciotti's trial unless the

defendant agreed to testify. The defendant did not make such an agreement. Even at the time of his trial, it was uncertain that the defendant actually wished to testify. [Citations omitted.]

As noted, there were several attempts by defense counsel to make defendant's willingness to testify a part of the record.

The State maintains that defendant's assistance in prosecuting Franciotti should be rejected because his testimony would have no credibility with a death sentence hanging over his head, adding that the State did not even want post-indictment assistance from DiFrisco because post-indictment assistance would lack credibility. The trial court was understandably troubled by the State's failure to prosecute Franciotti.

## B.

Concededly, the prosecutor has wide discretion to charge or not to charge persons suspected of criminal offenses. *State v. Hermann*, 80 *N.J.* 122, 127, 402 *A.*2d 236 (1979); *see also United States v. Nixon*, 418 *U.S.* 683, 693, 94 *S.Ct.* 3090, 3100, 41 *L.Ed.*2d 1039, 1055 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"). The constitutional principle of separation of powers discourages judicial review of the decisions of the executive branch of government. *See Morrison v. Olson*, 487 *U.S.* 654, 685–97, 108 *S.Ct.* 2597, 2616–22, 101 *L.Ed.*2d 569, 602–09 (1988).

Beyond purely constitutional concerns, the judiciary generally defers to the prosecuting attorney's discretion to charge or not to charge because "enforcement decisions are the product of prosecutorial value judgments and expertise, and [because] courts lack standards by which to review these decisions." Givelber, "The Application of Equal Protection Principles to Selective Enforcement of the Criminal Law," 1973 *U.Ill.L.F.* 88, 102. In the context of discriminatory enforcement cases, the general rule is:

"[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to

prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 *U.S.* 357, 364, [98 *S.Ct.* 663, 668,] 54 *L.Ed.*2d 604, [611] (1978). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. [*Wayte v. United States*, 470 *U.S.* 598, 607, 105 *S.Ct.* 1524, 1530, 84 *L.Ed.*2d 547, 556 (1985).]

Although broad, the prosecutorial discretion is not absolute. *Id.* at 608, 105 *S.Ct.* at 1531, 84 *L.Ed.*2d at 556; *In re Investigation Regarding Ringwood Fact Finding Comm.*, 65 *N.J.* 512, 516, 324 *A.*2d 1 (1974).

 Courts have considered the issue of limitations on prosecutorial discretion in several contexts but most frequently in the area of discriminatory or selective prosecution. In order to prevail on a claim of discriminatory enforcement, the defendant must plead and prove intentional selectivity as well as an unjustifiable basis for the discrimination. "[The] standards require petitioner to show both that the * * * enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte, supra*, 470 *U.S.* at 608, 105 *S.Ct.* at 1531, 84 *L.Ed.*2d at 556.

The burden in such cases is heavy. In the context of statutory schemes inviting judicial review, this Court has asserted a minimal but significant role in the review of the exercise of prosecutorial discretion. *See State v. Koedatich*, 112 *N.J.* 225, 250–59, 548 *A.*2d 939 (1988), *cert. denied*, —— *U.S.* ——, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989); *State v. McCrary*, 97 *N.J.* 132, 142, 478 *A.*2d 339 (1984); *State v. Leonardis*, 73 *N.J.* 360, 376–79, 375 *A.*2d 607 (1977).

In our death-penalty jurisprudence, we have had several occasions to consider the role of the prosecutor in administering our capital-murder statute. In *State v. McCrary, supra*, 97 *N.J.* 132, 478 *A.*2d 339, we asserted a limited role in reviewing the prosecutor's decision to seek the death penalty. *McCrary*

involved a death-penalty prosecution in which the defendant sought to have the aggravating factors dismissed for lack of supporting evidence. In response, the State argued "that prosecutorial charging discretion foreclosed the trial court from exercising jurisdiction." *Id.* at 137, 478 *A.*2d 339. We affirmed the trial court's decision to hold a *Wade*-type hearing to determine the sufficiency of the aggravating factors the State intended to prove. We said:

> Remaining respectful of and sensitive to a prosecutor's charging discretion, we seek to fetter it only to the extent necessary to protect a defendant's rights. Historically, a prosecutor has been vested with broad discretionary powers to be exercised in the conscientious discharge of the manifold responsibilities of his office. The effect of this broad grant of power has been to accord a presumption of validity to the conduct of the prosecutor.
>
> Our goal is to effect only a minimal intrusion into this area of prosecutorial discretion.
>
> [*Id.* at 142, 478 *A.*2d 339 (citations omitted).]

In *State v. Koedatich, supra,* 112 *N.J.* at 258, 548 *A.*2d 939, we acknowledged our holding in *McCrary* "that while prosecutorial decision-making is normally beyond [a court's] purview, fundamental fairness" may justify some "minimal intrusion." In addition, *N.J.S.A.* 2C:11–3 requires the court to conduct proportionality review when the defendant requests it. *State v. Ramseur,* 106 *N.J.* 123, 324, 524 *A.*2d 188 (1987). In *Koedatich,* we reviewed geographical data presented on the issue of prosecutorial discretion in capital cases to determine the likelihood that a homicide prosecuted as a capital case in one county would receive the same treatment in another county. 112 *N.J.* at 254–56, 548 *A.*2d 939. We also considered statewide data for evidence of gender or racial bias in capital prosecutions. *Id.* at 256–58, 548 *A.*2d 939. Finally, we recommended the adoption of guidelines for use by prosecutors throughout the state in selecting capital cases for prosecution. *Id.* at 258, 548 *A.*2d 939.

Defendant has made no showing of invidious discrimination but rather has premised his proportionality challenge on the basis that the reason for non-prosecution proffered by the

State has no support in the record. But the State has also determined that the only proof that it has—defendant's confession—even if repeated in court against Franciotti, will not be of sufficient probative value to convict Franciotti. As the State suggested in oral argument before us, it would be in "bad faith" to charge Franciotti with the murder. As the Essex County Prosecutor explained to the trial court: "The obligation is to see that justice is done, sir. To get an indictment that cannot be proved is not seeking justice." Yet, if DiFrisco was unwilling to cooperate in implicating Franciotti, why did he testify in his own trial concerning Franciotti's role?

Of course, the State need not believe in Franciotti's innocence when it does not indict him. Many guilty people can never be brought to trial. But the defendant implies now that the investigation must have generated evidence that Franciotti was nowhere near the Maplewood pizza shop on the day of the murder. Obviously, in what appears to be a gangland murder, the State must have investigated Franciotti's whereabouts when the crime took place. The assistant prosecutor seems to have regarded the case as such when he explained to the court: "In May of 1987 [DiFrisco] did not want to cooperate. That means, to me, that he was keeping with the code of silence. He did not want to say anything." But if the "code of silence" could not be broken, did telephone records disclose the presence or absence of contacts between the two? DiFrisco said that he called Franciotti "collect" when they were in communication. We do know that Franciotti and DiFrisco met each other at the New York Downstate Correctional Center when both were confined there in 1984. The record does not disclose any further contact between the two after they had both been released. DiFrisco testified that after the murder, he was returned to the Downstate Correctional Center for violating parole on another matter, and that he called Franciotti from there. No reference has been made to efforts to corroborate such calls, nor does the record before us reveal any.

Yet, we may surmise that not all is known about this case. Was DiFrisco's offer to testify against Franciotti conditioned on a deal that the prosecutor forego the death penalty against him or perhaps give him immunity? We cannot say that it would be arbitrary for a prosecutor to refuse such a bargain in a case like this. In many cases there is much more evidence that links the higher-up to a crime, such as a motive to kill or a known relationship gone bad. None of that was present here. We cannot, then, treat every hired-gun case as identical; we do not know the evidence that the State may have in each case. Nor can we say that kingpins are categorically more evil than executioners. Indeed, some may believe that morally they are indistinguishable, or even that the executioner is worse. There may not be a sufficient public interest to give up DiFrisco's case on the chance that Franciotti will be convicted.

### III

But given this state of the record, defendant then argues that his capital sentence must be set aside for want of any extrinsic corroboration of his confession. He relies on *State v. Lucas*, 30 *N.J.* 37, 56, 152 *A.*2d 50 (1959), in which the Court ruled that when a confession is offered for the truth of its contents,

the State must introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury, [to] afford[ ] ample protection for the accused and * * * to serve the ends of justice in the administration of the criminal law.

The rule of *Lucas* is that

[o]n motion to direct an acquittal on grounds of lack of corroboration the trial court must determine whether there is *any* legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy.

[*Id.* at 62, 152 *A.*2d 50 (emphasis added).]

The State counters that the *Lucas* rule applies only to the *corpus delicti* (*i.e.*, the body of the crime, usually meaning at common law the fact of death or the fact of an arson), and that

the *Lucas* reference to independent proof of "loss or injury" means here only the death of the victim, a point beyond doubt. The State asserts that there is no need to corroborate Franciotti's role in the murder. This doctrine generally applies when we are dealing with non-capital sentencing, an area in which courts are normally free to entertain evidence beyond that adduced at the guilt phase of the trial. *See State v. Marzolf,* 79 *N.J.* 167, 398 *A.*2d 849 (1979) (when imposing sentence, court is free to consider factors established, although defendant found not guilty of the charge at trial).

But capital sentencing is not like custodial sentencing. In capital sentencing the Rules of Evidence govern the admissibility of proofs by the State. *N.J.S.A.* 2C:11–3c(2)(b). The aggravating factors serve not just to measure the length of a sentence, but are regarded as "essential elements" of capital murder. As we ruled in *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130 (1987), *appeal after remand,* 110 *N.J.* 521, 542 *A.*2d 442 (1988), aggravating factors must be proven to outweigh beyond a reasonable doubt any mitigating factors that may be found. Even at common law, *corpus delicti* had a broader meaning, "the substance or foundation of a crime." *Black's Law Dictionary* 310 (5th ed. 1979). Hence we cannot say that the *Lucas* rule is irrelevant here. It is a rule of evidence; rules of evidence apply in the sentencing phase of the State's case as well as the guilt phase. *N.J.S.A.* 2C:11–3c(2)(b).

The more pointed question is whether there was, within the circumstances of the case, corroboration of Franciotti's role as one who paid the hired gun to kill in order to avoid detection. Surely the surrounding circumstances bespeak the crime. There is no known connection between DiFrisco and the pizzeria owner. Why else would he have done it? Is the fact that there is no other explanation enough corroboration?

There has been much debate about the need for any such corroboration rule. The rule's origins are unsettled in English law, 7 J. Wigmore, *Wigmore on Evidence,* § 2070, at 508

(Chadbourn rev. 1978), and care must be taken not to subject the rule to "loose judicial comment" or to give it "an unjustifiably broad meaning." *Id.* at § 2072, at 524. Not long ago, we reviewed the rules governing the evidence that will suffice to establish corroboration of a confession in *State v. Krieger*, 193 *N.J.Super.* 568, 475 *A.*2d 608 (App.Div.1983), *rev'd,* 96 *N.J.* 256, 475 *A.*2d 563 *cert. denied,* 469 *U.S.* 1017, 105 *S.Ct.* 431, 83 *L.Ed.*2d 358 (1984). In that case, a 4–3 majority of the Court sustained the conviction of an arsonist although the details of his confession were not corroborated in every respect. 96 *N.J.* at 257, 475 *A.*2d 563. The four members of the majority adopted the views of Judge Michels' dissent in the Appellate Division, 193 *N.J.Super.* at 579, 475 *A.*2d 608, but every member of the Court agreed with the general principles of law applied by both majority and dissent. 96 *N.J.* at 257, 475 *A.*2d 563.

The majority and dissent differed in *State v. Krieger* on the extent to which the extrinsic evidence corroborated the trustworthiness of the confession. In his dissent, Judge Michels reviewed aspects of the confession—the defendant's reference to the use of a fire extinguisher, the fact of an earlier fire, and the absence of harm. 193 *N.J.Super.* at 579–83, 475 *A.*2d 608. He found each of them corroborated in the State's proofs. *Id.* at 580–82, 475 *A.*2d 608. Thus, Judge Michels concluded that "there was more than sufficient corroborative evidence to establish that defendant was telling the truth * * *." *Id.* at 582, 475 *A.*2d 608. Although there were missing details or discrepancies in the story (*e.g.,* how defendant could have done all that he said in the short time described), such gaps were but "arguments and speculations [that] do not undercut *as a matter of law* the truthfulness of defendant's confession. They simply raise issues of fact as to corroboration of the confession, which are properly to be resolved by the jury." *Id.* at 583, 475 *A.*2d 608 (emphasis added) (Michels, J.A.D., dissenting). In short, some corroboration is required as a matter of law but if

there is such corroboration, the jury should resolve "arguments and speculation" about its weight and sufficiency.

Applying that two-part test, we must first ask what "independent proof of facts and circumstances" corroborates defendant's statement that Franciotti hired him to silence the pizzeria owner. No link has been developed between Franciotti and the victim. The proofs that appear thus far are as follows: Detective Saunders of Maplewood said: "No one positively identified them [DiFrisco and Franciotti]" as having been at Jack's Pizzeria, and there was "no evidence that Mr. Potcher was selling drugs or anything in the pizzeria." Essex County Detective Kennedy said they had interviewed

witnesses through the Maplewood Police Department to see if the names or anything like that rang a bell between Franciotti, DiFrisco and Edward Potcher. We could not make any connections anywhere.

\* \* \* \* \* \* \* \*

We checked with other law enforcement agencies to see if there was a connection, to see if Mr. Franciotti was in the mob, as Mr. DiFrisco said he was, whether there were any organized crime connections. We interviewed the witnesses. We could come up with no connection between the victim, Mr. Franciotti and Mr. DiFrisco [with the exception of the Downstate Correctional Facility].

Bronx County Detective Kukk was not permitted to say in the *Miranda* hearing whether he believed the story about Franciotti. He did say at the penalty phase: "He answered most of the questions, sir, except for the fact that I wanted to know Franciotti's telephone number. \* \* \* I called the DA's office in Manhattan, sir, who I felt knew about the mob connections in the city. I gave him the name [Franciotti]. I got back a negative result." Kukk nevertheless took the story to his supervisor: "No one in their right mind would ever tell me that they did a homicide for a grand larceny auto. \* \* \* He [the supervisor] thought I was kidding trying to make overtime by giving him this outlandish story of a homicide."

Furthermore, the trial court found that "the State had no evidence to link the defendant with Franciotti except for the fact that Franciotti and the defendant had known each other in

jail." On cross-examination, defendant admitted that the statement in his confession about taping his fingers to avoid fingerprints was false.

Does it follow that there is not legally sufficient corroboration? New Jersey's requirements are narrow with respect to the quantum of evidence required to establish corroboration in law. 7 J. Wigmore, *supra*, § 2071, at 515 n. 3 (citing, *inter alia, State v. Lucas, supra; State v. Johnson*, 31 *N.J.* 489, 158 *A.*2d 11 (1960)). The *Lucas* Court, quoting *McCormick, Evidence*, at 230 n. 5 (1954), stated that "hard-and-fast rules requiring corroboration are as likely to obstruct the punishment of the guilty as they are to safeguard the innocent." 30 *N.J.* at 52, 152 *A.*2d 50.

Under the New Jersey rule, the State need not produce independent proof that Franciotti paid DiFrisco but must produce only "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness." *Lucas, supra*, 30 *N.J.* at 56, 152 *A.*2d 50. Or, in other words, "[a]ll elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." *Smith v. United States*, 348 *U.S.* 147, 156, 75 *S.Ct.* 194, 199, 99 *L.Ed.* 192, 200–01 (1954), *quoted in* 7 J. Wigmore, *supra*, § 2071, at 512 n. 3.

Obviously, some aggravating factors do not easily admit of extrinsic corroboration. The killer who admits killing for the thrill of it may indeed find his confession corroborated by the circumstances of the crime, *e.g.*, no prior relationship between the victim and the killer. But even if the extrinsic circumstances of the victim's death and the prison relationship corroborate the story, what is missing in this case is evidence of the application of the second part of the *Lucas* test, namely, the fact-finder's admonition to deliberate about the presence or

absence of corroborative evidence in evaluating the trustworthiness of the confession.

It is the jury, or in this case the judge sitting as jury, that "is the essential link between capital punishment and the standards of decency contained in the eighth amendment." *State v. Zola*, 112 *N.J.* 384, 438, 548 *A.*2d 1022 (1988) (citing *Spaziano v. Florida*, 468 *U.S.* 447, 469–70, 104 *S.Ct.* 3154, 3167, 82 *L.Ed.*2d 340, 359 (1984) (Stevens, J., concurring and dissenting)). "At the heart of the guarantee of a fair trial is the 'jury's impartial deliberations upon the guilt of a criminal defendant based solely upon the evidence *in accordance with proper and adequate instructions....*'" *State v. Collier*, 90 *N.J.* 117, 122, 447 *A.*2d 168 (1982) (quoting *State v. Simon*, 79 *N.J.* 191, 206, 398 *A.*2d 861 (1979)) (emphasis added). It is "the nondelegable and nonremovable responsibility of the jury to decide" the question of guilt or innocence *in accordance with correct principles of law.* *State v. Ingenito*, 87 *N.J.* 204, 211, 432 *A.*2d 912 (1981).

The confession here does not make this case different. Confessions are not self-executing. As with any other part of a prosecutor's case, a confession may be shown to be "insufficiently corroborated or otherwise deemed unworthy of belief." *Lego v. Twomey*, 404 *U.S.* 477, 486, 92 *S.Ct.* 619, 625, 30 *L.Ed.*2d 618, 626 (1972); *see also State v. Krieger, supra*, 193 *N.J.Super.* at 583, 475 *A.*2d 608 (Michels, J.A.D., dissenting) ("issues of fact as to corroboration of the confession * * * are properly to be resolved by the jury"). How did the judge sitting as jury resolve the issues of fact and under what standard? This record does not tell us. In the ordinary jury trial, a defendant would be entitled to request and receive a charge to the jury on its duty with respect to issues of corroboration. *See State v. Lucas, supra*, 30 *N.J.* at 62–63, 152 *A.*2d 50 (not plain error with "clear capacity to bring about an unjust result" to have failed to charge jury specifically with respect to corroboration in light of balance of charge and "entire thrust of defense"); *accord State v. Ordog*, 45 *N.J.* 347, 364, 212 *A.*2d 370 (1965), *cert. denied*, 384 *U.S.* 1022, 86 *S.Ct.* 1942, 16

*L.Ed.*2d 1025 (1966) (not plain error where "the judge did not specifically charge the jury on [its] duty to find corroboration, in light of his charge that the weight and credibility to be given to the confession were for the jury in the light of all the evidence"). This comports with Wigmore's admonition: "No one doubts that the warning which it conveys [the need for corroboration of accused's confession] is a proper one, but it is a warning which can be given with equal efficacy by * * * the judge in his charge on the facts." 7 J. Wigmore, *supra*, § 2070, at 510.

In a capital case, when a confession is used to establish the aggravating factors of capital murder, the court must first determine whether there is sufficient corroboration in law to permit the sentencer to consider the confession. When, as here, there is sufficient corroboration in law (there was a prior relationship between Franciotti and DiFrisco; there was a murder as DiFrisco described it), the sentencer must understand the relevance of corroboration in its evaluation of the evidence. The jury (or the judge sitting as jury) must find the statutory aggravating factors to be present beyond a reasonable doubt and find that they qualitatively outweigh any mitigating factors beyond a reasonable doubt. *State v. Bey,* 112 *N.J.* 123, 161, 548 *A.*2d 887 (1988). The jury (or judge sitting as jury) may consider the presence or absence of any corroborating proofs offered by the State in determining the existence and weight to be accorded the aggravating factors charged. When there is no extrinsic corroboration of the aggravating factors themselves, the jurors must be satisfied beyond a reasonable doubt that the confession itself is sufficient to establish the aggravating factors beyond a reasonable doubt.

A judge sitting as a jury must have that understanding of the law. There is no evidence that this legal format was followed. There are no instructions that a judge sitting as a jury gives to himself or herself.

Our Court Rules do not require a judge conducting a criminal bench trial to set forth the principles of law that the court follows. The applicable rule, *Rule* 1:7–4, reads in part:

> In civil actions tried without a jury and on every motion decided by written orders which are appealable as of right, the court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon. In criminal, quasi-criminal and juvenile actions tried without a jury, the court shall make a general finding and shall, in addition, on request find the facts specially. The court shall thereupon direct the entry of the appropriate judgment.

This accords with the general principle that

> [i]n actions at law tried to the court, * * * either party has the right to have the judge declare the theory of the law by which he is governed in reaching his conclusions. The fact that the verdict is to be rendered by the court sitting as a jury, it has been said, does not impair the right of either party to a correct statement of the principles by which the decision of the issues of fact should be controlled; these principles are enunciated by the so-called declarations of law which are analogous to instructions to the jury * * *.
>
> [89 *C.J.S. Trial* § 598, at 406 (1955).]

But although judges conducting civil bench trials and deciding motions must state their conclusions of law, judges in criminal bench trials often need not. The general theory is that these judges are presumed to know the law. *See State v. Rowland,* 509 *So.*2d 779 (La.App.2d Cir.), *cert. denied,* 513 *So.*2d 290 (La.1987); *State v. Aldridge,* 450 *So.*2d 1057 (La.App. 1st Cir.1984). *Contra State v. Sargent,* 241 *Mo.App.* 1085, 1097, 256 *S.W.*2d 265, 273 (1953) ("It is just as important in a criminal case tried by a court without the aid of a jury to know the theory of law upon which the trial court ruled the action as it is in a civil action."). However, in those cases in which a criminal bench trial is conducted, we may assume that the issues are more of fact than of law. Often, as in *Rowland, supra,* and *Aldridge, supra,* criminal bench trials involve uncomplicated legal issues such as, in the cases above, simple battery or cruelty to animals. In New Jersey, by far the vast majority of bench trials involve simple uncomplicated fact issues, such as motor vehicle or disorderly-persons offenses.

Whether due process requires a particular step in the decision-making process is judged under the familiar three-factor

standard of *Mathews v. Eldridge*, 424 *U.S.* 319, 96 *S.Ct.* 893, 47 *L.Ed.*2d 18 (1976). *See Black v. Romano*, 471 *U.S.* 606, 618, 105 *S.Ct.* 2254, 2261, 85 *L.Ed.*2d 636, 647 (1985) (Marshall, J., dissenting) (explanations required when they would significantly contribute to "fairness and reliability"). The *Mathews* test considers three factors: (1) the private interest affected; (2) the risk of error and probable value of additional procedural safeguards; and (3) the government's interest. 424 *U.S.* at 335, 96 *S.Ct.* at 903, 47 *L.Ed.*2d at 33.

Applying that test, we must ask if a "declaration of law" is a step in the decision-making process reasonably to be required in a capital bench trial. As noted, most criminal bench trials are routine and pose no occasion to consider whether a "declaration of principles" is required. But when, as here, in a capital sentencing, the question of law is obviously of great importance and of sufficient complexity, a reviewing court will want to know that the lower court understood and applied the correct principles of law.

Under the *Mathews* test, given the enormity of the public and private interests affected and the risk of error suggested by these facts, a declaration of law would certainly contribute to the reliability of the decision-making process. It may not be a constitutional command but it comes down to whether we want to "presume" that a capital defendant has received a fair trial.

The State argues that a judge sitting as a jury is presumed to know the law. The trial court stated:

> I have been sitting in this courtroom on criminal trials for many years and I have for many years instructed juries on their duty to follow the law. Sitting in place of a jury, I can do no less than to practice what I preach.

But what law is it? Is it the law as the Attorney General sees it, that the *Lucas* rule has no relevance to the sentencing phase of a capital case? The trial court's only statement with respect to corroboration of the confession was with respect to the killing itself. It said:

The defendant confessed. However, the confession is corroborated by other circumstantial evidence obtained during the investigation that directly and inexorably ties Mr. DiFrisco to the killing.

No corresponding finding of corroboration directly and inexorably ties the killing to Mr. Franciotti, the tie that establishes capital murder.

Of course, some will see this as sophistry, if not worse, in the context of a case in which the defendant insists that his confession is true to the extent that he repeats it at his trial. His attorney's trial strategy was to convince the court that his client had killed at the behest of the older and more culpable Franciotti, whom he described as a drug-dealer, and that this implication of Franciotti was a mitigating factor. It makes no sense, the argument goes, to apply the *Lucas* rule. But making up a story like this one makes about as much sense as confessing to capital murder to beat a car-theft rap.

Finally, it may be argued that a defendant's testimony in court ought require no corroboration. *See State v. Gleitsmann*, 62 *N.J.Super.* 15, 161 *A.*2d 747 (App.Div.), *certif. den.*, 33 *N.J.* 386, 164 *A.*2d 849 (1960) (stating the proposition but finding corroboration to statement made before Law Enforcement Council). That may be so in non-capital cases, but here, however scant the quantum of corroboration, the reason for the corroboration rule remains: "[I]ts foundation lies in a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused." *Smith v. United States, supra*, 348 *U.S.* at 153, 75 *S.Ct.* at 197, 99 *L.Ed.* at 198.

Our history and tradition suggest no less. An 1893 amendment to our former death-penalty law substituted for the prior practice (which allowed judges discretion to accept such pleas) "the mandate of the law, that the citizen shall not be adjudged to death upon his own confession, but that, in *favorem vitae* [in favor of life], the [S]tate shall prove, in all respects, to the satisfaction of a jury, the crime laid in the indictment." *State*

*v. Genz,* 57 *N.J.L.* 459, 463, 31 *A.* 1037 (Sup.Ct.1895). To this end, the authority of the court to impose the death sentence on a plea of guilty was withdrawn. The law was altered so as to ban a plea of guilty and to authorize the court in its discretion to accept a plea of *non vult,* in which event "the sentence to be imposed * * * shall be the same as that imposed upon a conviction of murder of the second degree." *L.* 1893, *c.* 36.

In a bitter twist of irony, this ameliorative amendment of our death-penalty law, which allowed defendants to *avoid* the possibility of death when they pleaded *non vult* or no contest to a murder charge, was found to invalidate the scheme of capital punishment for creating too high an inducement to forego the right to have the charges proved by the State. *State v. Forcella,* 52 *N.J.* 263, 279, 245 *A.*2d 181 (1968), *rev'd in part* by *Funicello v. New Jersey,* 403 *U.S.* 948, 91 *S.Ct.* 2278, 29 *L.Ed.*2d 859 (1971). Of course, these humane amendments were made in the context of a death-penalty law that at one time made the sentence of death automatic for first-degree murder and only later allowed juries to recommend imprisonment. Nevertheless, the underlying State policy remained constant—that of "being opposed to the imposition of a death sentence upon a defendant's plea * * *." *Forcella, supra,* 52 *N.J.* at 277, 245 *A.*2d 181.

Hence, we see no occasion to depart from the principles of *Lucas* in this setting. Our State policy seems always to have favored that something more than his or her words would send a defendant to death. Capital punishment has never been a game to be played on a defendant's terms. Society has its own interest in the appropriateness of a capital sentence. We ought no more risk departure from the rule of law in this context than we would when a defendant seeks to bar his or her attorney from offering evidence in mitigation of the death penalty. *State v. Koedatich,* 98 *N.J.* 553, 489 *A.*2d 659 (1984); *see also N.J.S.A.* 2C:11–3e (capital-punishment act requires the Office of the Public Defender to appeal capital sentences even when the defendant wishes not to appeal). Whatever perverse truth lies

behind this case, it must be tested in accordance with correct legal principles.

There is a paradox in the proofs: the sentencing court has found beyond a reasonable doubt that defendant acted as a hired gun for Franciotti. In contrast, the State's own investigation of the case has apparently resulted in a conclusion that there is insufficient extrinsic evidence presented of a connection between the two on the date in question to bring the matter before a grand jury. We need not resolve whether there is a constitutional or statutory impediment to sentencing a gunman to death while the higher-up goes free, but it is surely unusual, although this has been an unusual case from its inception. Even the trial court felt compelled to take the most unusual step of speaking *ex parte* to the State concerning whether it was conscientiously pursuing justice. But DiFrisco has played cat-and-mouse with the police. He would lead them to the bait, then withdraw it. The assistant prosecutor's recollection of the failed phone call was not that the defendant had been cautioned by his father but that he refused to make the call. Moreover, defendant's own counsel apparently never took advantage of an offer to review the State's file.

Regardless of the explanations, when, in a capital case, there is no congruency between the defendant's statement and the State's investigative results with respect to the aggravating factors that are essential elements of capital murder, the fact-finder ought to be instructed to determine, with respect to the essential elements of capital murder, whether the State has "introduce[d] independent proof of facts and circumstances [that] strengthen or bolster the confession and tend to generate a belief in its trustworthiness," *State v. Lucas, supra,* 30 *N.J.* at 56, 152 *A.*2d 50.

## IV

To sum up, "[i]mposition of the penalty of death is 'profoundly different from all other penalties,' *Lockett v. Ohio,* 438 *U.S.*

586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978), and, as such, requires more, not fewer, procedural safeguards * * *." *State v. Biegenwald,* 96 *N.J.* 630, 639, 477 *A.*2d 318, *clarified,* 97 *N.J.* 666, 483 *A.*2d 184 (1984). It would contradict that principle not to try a capital defendant by the everyday procedures of the law. In any other case a jury evaluating the trustworthiness of a confession would have to be instructed to consider the extent to which the State's independent proofs bolster a confession and generate belief in its reliability. It may be that the sentencing court applied those principles of law, but its sentencing opinion and judgment make no reference to them.

The public wants to see that our death penalty works. It is understandable. We see how swiftly the death penalty is administered in other societies. But we would expect that the first to die in New Jersey would at least have met the statutory prerequisites of having the sentencer determine in accordance with law whether the State has established beyond a reasonable doubt the aggravating factors that a man named Franciotti hired DiFrisco to kill in order to silence the victim. The State may use the defendant's confession to establish these factors but must do so in accordance with the principles of *State v. Lucas.*

One might wonder if it is not unfair to insist on those requirements here. The crime is so cruel, the defendant so remorseless. We can only repeat what we said in *State v. Biegenwald, supra:*

> [W]e note that there is no substantial problem of judicial administration here. Although our holding will require retrial of the sentencing proceeding in this case * * *, the price is relatively small for assuring fairness in this most awesome of all determinations: shall the defendant live or shall he die?
>
> [106 *N.J.* at 67, 524 *A.*2d 130 (footnote omitted).]

Obviously, the matter would be much simplified if the cause could be remanded to the trial court for clarification of its ruling or for further findings. The issue of guilt and death-eligibility has been met by the plea in this case. Only the penalty

phase need be rerun. This Court has on several occasions followed the practice of directing a remand for a hearing before the trial court when a direct appeal from a conviction was pending before us, without vacating the conviction or ordering a new trial. *See State v. Loray*, 46 *N.J.* 179, 186–87, 215 *A.*2d 539 (1965) (citing *State v. Hutchins*, 43 *N.J.* 85, 202 *A.*2d 678 (1964) (legality of search and seizure), *Appellate Division reversed and convictions affirmed on return of remand*, 44 *N.J.* 49, 207 *A.*2d 163 (1965); *State v. Doyle*, 40 *N.J.* 320, 191 *A.*2d 478 (1963) (legality of search and seizure), *convictions affirmed on return of remand*, 42 *N.J.* 334, 200 *A.*2d 606 (1964); *State v. LaPierre*, 39 *N.J.* 156, 188 *A.*2d 10 (voluntariness of confessions; convictions affirmed), *cert. denied*, 374 *U.S.* 852, 83 *S.Ct.* 1920, 10 *L.Ed.*2d 1073 (1963); *State v. Scrotsky*, 38 *N.J.* 14, 182 *A.*2d 868 (1962) (legality of search and seizure), *conviction reversed on return of remand*, 39 *N.J.* 410, 189 *A.*2d 23 (1963)). However, each of those cases involved "a preliminary constitutional issue" or what the Court called a "subsidiary issue," *Loray, supra*, 46 *N.J.* at 186–87, 215 *A.*2d 539, not an ultimate factual determination. Although use of that procedure here would not afford the government an opportunity to "introduce new evidence in an attempt to save a conviction * * *," the procedure at least presents a close question on whether, "[i]f this does not technically infringe the protection against double jeopardy it seems to * * * violate its spirit." *United States v. Shotwell Mfg. Co.*, 355 *U.S.* 233, 250, 78 *S.Ct.* 245, 256, 2 *L.Ed.*2d 234, 245 (1957) (Black, J., dissenting). Given the cost of prosecuting capital cases, we do well to avoid the possibility of constitutional error in these cases.

And as we stated in *Biegenwald, supra*, 106 *N.J.* at 70, 524 *A.*2d 130, "[w]hile the original jury [there deciding guilt and penalty] has the advantage of having heard the testimony, * * * the disadvantages [of empaneling the same jury] far outweigh the advantages." Among the concerns is whether "any juror's mind had become unalterably fixed on the question of sentencing." *Ibid.*

Our decision is limited to the penalty phase of defendant's trial; his plea to capital murder is upheld, and his conviction will stand. On remand of the penalty phase, defendant may seek a new trial with the same or another judge, or he may seek to withdraw his waiver of jury trial. Although the general rule with respect to withdrawal of a waiver of the right to a jury trial is that it is within the discretion of the trial court, there is authority to the effect that in criminal retrials, when an appellate court remands because of error, neither party is bound by a prior waiver. *See United States v. Lee*, 539 *F.*2d 606 (6th Cir.1976); *United States v. Lutz*, 420 *F.*2d 414 (3d Cir.), *cert. denied*, 398 *U.S.* 911, 90 *S.Ct.* 1709, 26 *L.Ed.*2d 73 (1970). Given the difficulties that we noted in *Biegenwald*, *supra*, 106 *N.J.* at 70, 524 *A.*2d 130, defendant should have the right on retrial to withdraw his waiver of jury trial or seek a bench penalty trial before another judge. Prior to such a retrial (or, if relevant, during it), the State should avail itself of the opportunity to dispel any notion of arbitrariness in the prosecutorial decision not to pursue the higher-up in this murder.

Should the defendant obtain additional evidence on remand (in the sense that the State's investigation tends to disprove that Franciotti could have been in New Jersey on the date of the murder), the sentencer will have to reconcile that evidence with the confession. Should the evidence "strengthen or bolster" the confession, it will add to its evidentiary reliability and establish the groundwork for a case against Franciotti. In either event, justice is done.

The conviction of murder is affirmed. The sentence of death is reversed and the matter remanded to the Law Division for retrial of the sentencing proceeding in accordance with this opinion.

HANDLER, J., concurring in part and dissenting in part.

The majority reverses defendant's death sentence because the only evidence that converts this murder into a capital crime,

his confession that he had been hired to kill, was insufficiently corroborated. Although I agree with its conclusion, I write separately for several reasons. I believe that defendant's guilty plea should be set aside because it was obtained without satisfying the exacting requirements that must govern guilty pleas to capital murder. Further, I believe the standard for determining the admissibility of a capital-murder confession, when used to establish aggravating factors to impose a death sentence, should be more stringent than the conventional standard governing the admissibility of confessions in criminal cases. In addition, the evidence that was used to establish the aggravating factors was, in effect, double-counted, thereby distorting the balancing process. Finally, this case exemplifies the twin problems of unacceptable disproportionality and the absence of guided prosecutorial discretion: The State has prosecuted this defendant for capital murder but has failed to pursue and prosecute the person who hired him to do the killing.

These issues bear comment. In view of the evolving nature of capital-murder jurisprudence, however, I reiterate without further exposition my position that the State's capital-murder statute, as enacted, interpreted and applied, violates the State's Constitution. *See, e.g., State v. Davis*, 116 *N.J.* 341, 377, 561 *A*.2d 1082 (1989) (Handler, J., dissenting); *State v. Bey (II)*, 112 *N.J.* 123, 188–90, 548 *A*.2d 887 (Handler, J., dissenting).

## I.

The Court does not address the validity of defendant's guilty plea. For reasons previously expressed, I would reverse the guilty plea in this case. *See, e.g., State v. Davis, supra*, 116 *N.J.* at 377, 561 *A*.2d 1082 (Handler, J., dissenting); *State v. Gerald*, 113 *N.J.* 40, 154–57, 549 *A*.2d 792 (1988) (Handler, J., dissenting). The validity of a guilty plea is of such fundamental importance in the context of a capital-murder prosecution that any serious error that impugns its validity must be viewed as plain error on appeal. *R.* 2:10–2.

*Rule* 3:9–2 provides that a guilty plea is not valid unless the defendant understands the nature of the charges and consequences of the plea. Recently, we stressed that for a plea to be valid, "all material terms and relevant consequences [must] be clearly disclosed, fully understood, and knowingly and voluntarily accepted by the defendant." *State v. Warren,* 115 *N.J.* 433, 444, 558 *A.*2d 1312 (1989) (citations omitted). However, as I said in *Davis* with respect to the acceptance of a guilty plea to capital murder, there should be:

> a heightened application of each of the major requirements that currently govern the validity of a guilty plea. These relate to the full disclosure and explanation of all material aspects of the plea, the adequacy of the defendant's knowledge and understanding concerning the basis for and consequences of a guilty plea, and the voluntariness of the plea; all of these relate importantly to the accuracy of the underlying facts that support criminal guilt.
>
> [116 *N.J.* at 384, 561 *A.*2d 1082 (citation omitted).]

Under *Rule* 3:9–2, a defendant in an ordinary criminal case can, and frequently does, supply the factual basis for his plea. However, the Rule creates an exception for capital defendants. *Rule* 3:9–2 states:

> When the defendant is charged with a crime punishable by death, *no factual basis shall be required from the defendant* before entry of a plea of guilty to a capital offense or to a lesser included offense, provided the court is satisfied from the proofs presented that there is a factual basis for the plea. (Emphasis added.)

The rationale for this singular exception is that a defendant exposed to the death penalty should not be required to state anything that can support an aggravating factor; he need not aid in rendering his own death sentence. *See* Comment, Supreme Court Committee on Criminal Procedure, *reprinted in Pressler, Rules Governing the Courts of the State of New Jersey,* 533 (1989).

Nevertheless, here the trial court elicited and relied on defendant's testimony under oath as the factual basis for the guilty plea to capital murder. Defendant recounted not only the murder itself but his agreement with Franciotti, which became the factual basis for the aggravating factors and capital murder. In its own words, the court accepted the defendant's

guilty plea "based on Mr. DiFrisco's statement." Our Rules of Practice governing guilty pleas in capital causes bar this procedure.

Further, the defendant apparently did not enter the plea with full understanding. The relationship between a conviction based on a guilty plea and the subsequent sentencing proceeding must be carefully structured and fully explained to a defendant prepared to plead guilty to capital murder. As I emphasized in *Davis:*

> [T]he trial court in a capital case should explain that once it has accepted the plea, the defendant is to be turned over to a jury, which will decide his or her fate. Further, the defendant should be made aware of precisely how the jury reaches its determination. Therefore, the concept of aggravating and mitigating factors, the elements for determining the existence of such factors, the balancing process entailed in their weighing and the standard of proof that applies should also be explained. The defendant should thus be made cognizant of what the State must prove, and is prepared to prove, to establish the aggravating factor(s) alleged in the case, and must be given an adequate basis to consider and determine the likely outcome of the sentencing phase. *See* [*State v. Taylor,* 80 *N.J.* 353, 363, 403 *A.*2d 889 (1979)]. Finally, because it is a guilty plea that automatically exposes the defendant to a sentencing trial, the court should also require the State to demonstrate the evidence available to prove aggravating factors.
>
> [*State v. Davis, supra,* 116 *N.J.* at 388–89, 561 *A.*2d 1082 (Handler, J., dissenting) (footnote omitted).]

The Court does not dispute the validity of this standard.

In this case, the trial court did not carefully, accurately or comprehensively review and explain these matters to the defendant. The court is obligated to explain the penal consequences of a guilty plea. *See, e.g., State v. Warren, supra,* 115 *N.J.* at 447, 558 *A.*2d 1312; *State v. Taylor,* 80 *N.J.* 353, 363, 403 *A.*2d 889 (1979); *State v. Nichols,* 71 *N.J.* 358, 361, 365 *A.*2d 467 (1976); *R.* 3:9–2. In a capital-murder case this must include a reasonably accurate description of what will ensue in the penalty-phase trial. *See, e.g., State v. Davis, supra,* 116 *N.J.* at 388–89, 561 *A.*2d 1082. The explanation of the penal consequences of a guilty plea in a capital case must encompass a description of the evidence, a projection and analysis of its anticipated use, a comprehensive itemization of critical possible

determinations, and some estimate of the possible or probable consequences.

Here, the court did none of these things. It failed to review the nature of any of the evidence to be introduced as proof of the aggravating factors or explain the standard of proof by which each factor could be established. The court also failed to indicate how this evidence would be applied or the possible determinations and likely consequences that could ensue from the receipt of such evidence. These omissions were critical because the primary evidence of aggravating factors in the case was defendant's uncorroborated confession. *See* discussion, *infra* at 262–270, 571 *A.*2d at 918–923. Furthermore, the court did not fully explain the balancing process of aggravating and mitigating factors to enable defendant to gauge the likelihood of the death penalty versus life imprisonment.

Perhaps more problematic in this case is the court's failure to explain to defendant the ramifications of his decision to forego a penalty-phase jury.

> The defendant may, of course, waive a jury for the penalty phase. The court should explain the ramifications of such a course. I would think it incumbent upon the Court to explain the twelve-fold reduction in the chance of avoiding the death penalty by foregoing a jury trial. Indeed, the chance may be greater: there is a twelve-fold chance that a single juror may not find the existence of a necessary aggravating factor and, also, the additional twelve-fold chance that a single juror may not find that existing aggravating factors outweigh mitigating factors beyond a reasonable doubt. *See, e.g., State v. Biegenwald,* 106 *N.J.* 13, 53–67 [524 *A.*2d 130] (1987).
>
> [*State v. Davis, supra,* 116 *N.J.* at 388 n. 6, 561 *A.*2d 1082 (Handler, J., dissenting).]

The trial court did not fully explain to the defendant the significant difference between a trial by jury and a trial by judge to determine whether the death penalty should be imposed.[1] The trial court indicated only that jury unanimity

---

[1] The trial court's explanation was as follows:

> THE COURT: Now, do you understanding that although you are entering a plea of guilty to murder, although you are about the enter that plea of

would be required in the weighing or balancing of aggravating and mitigating factors. The trial court never informed defendant that the jury would be required to be unanimous in its determination of the existence of aggravating factors. *State v. Bey (II), supra,* 112 *N.J.* at 159, 548 *A.*2d 887. It informed defendant neither that the jury need not be unanimous with respect to its determination of mitigating factors, *id.* at 159–160, 548 *A.*2d 887, nor that an individual juror, in weighing aggravating and mitigating factors, could consider a mitigating factor found by that juror even though it was not found by other jurors, *id.* at 160, 548 *A.*2d 887. Most importantly, the court did not explain to the defendant that, after having been instructed with respect to each critical determination it would

---

guilty to murder at this time, Mr. DiFrisco, that there has to be another hearing to decide what the sentence shall be?

THE DEFENDANT: Yes, sir.

THE COURT: And do you further understand that if this Court should find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, that this Court could impose the death penalty?

THE DEFENDANT: Yes, sir.

THE COURT: And in your discussions with Mr. DeLuca have you considered the fact that you are leaving the decision to this Court rather than to twelve jurors?

THE DEFENDANT: Yes, sir.

THE COURT: And you realize, of course, that the twelve jurors, each of them, all twelve would have to be convinced beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors in order for the Court to impose the death penalty?

THE DEFENDANT: Yes, sir.

THE COURT: And do you realize that if only one of them were not so convinced, that this Court could not impose the death penalty?

THE DEFENDANT: Yes, sir.

THE COURT: And you are willing to rely upon one person rather than twelve, Mr. DiFrisco, where you have a possibility that one of those twelve would exempt you from the death penalty?

THE DEFENDANT: Yes, sir.

THE COURT: You have thought this over carefully?

THE DEFENDANT: Yes, sir.

THE COURT: And you still wish to plead guilty?

THE DEFENDANT: Yes, sir.

be required to make—determining, successively, the existence of aggravating factors, the existence of mitigating factors, and the comparative weight to be given to aggravating and mitigating factors—the jury would also have to be instructed that *its* ultimate verdict would result in the imposition of the death penalty or life imprisonment. In other words, the court failed totally to advise the defendant that the jury would be instructed in appropriate form that it would be ultimately responsible for whether the defendant lives or dies. *State v. Bey (II)*, *supra*, 112 *N.J.* at 158, 548 *A.2d* 887. Thus, it is a grave distortion to suggest (as the court did here) that the chances for an acquittal of the death sentence are only 12:1 if tried by a jury compared to a trial by judge; rather the chances would be infinitely greater. *See State v. Davis, supra,* 116 *N.J.* at 388 n. 6, 561 *A.2d* 1082. These indisputably material omissions are fatal to a full understanding of the penal consequences of defendant's guilty plea. *See State v. Warren, supra,* 115 *N.J.* at 447, 558 *A.2d* 1312; *State v. Taylor, supra,* 80 *N.J.* at 363, 403 *A.2d* 889; *State v. Kovack,* 91 *N.J.* 476, 484, 453 *A.2d* 521 (1982); *State v. Nichols, supra,* 71 *N.J.* at 361, 365 *A.2d* 467.

For these reasons, I would reverse the defendant's conviction based on the acceptance of his guilty plea.

## II.

As noted, on the day of the guilty plea, the court without a jury commenced a penalty trial. The record of that trial discloses the centrality of defendant's confession to the court's ultimate determination that the aggravating factors were established beyond a reasonable doubt and, by the same standard of proof, outweighed all mitigating factors, thereby necessitating the sentence of death. The court's acceptance of defendant's confession as evidence of these aggravating factors is thus a pivotal issue in this case.

At the penalty trial, defendant took the stand and reiterated his earlier confession. Defendant endeavored to stress that the

combined effect of his conscience and promises of assistance by the police spurred his confession. Defendant further testified that he had a substantial drug habit since 1982 and owed Franciotti money for drugs at the time Franciotti solicited his services to murder a person "who was about to put [Franciotti] in a jackpot."

The prosecutor contended that an agreement to commit the murder for $2,500 "rather than to see [Franciotti] go to prison," constituted the aggravating factors of *N.J.S.A.* 2C:11–3c(4)(d) and (f). He also asserted that the murder was an "execution" and thus constituted the aggravating factor of *N.J.S.A.* 2C:11–3c(4)(c). The prosecutor denigrated the mitigating factors raised by defendant. He characterized defendant's confession as a limited form of cooperation, and argued that defendant's recent willingness to testify against Franciotti did not rise to the level of rendering substantial assistance to the State.

The trial court determined that the State had not proven that the murder was outrageously or wantonly vile, *N.J.S.A.* 2C:11–3c(4)(c). It did find, however, that the State had proven beyond a reasonable doubt the existence of two aggravating factors: that defendant committed the murder as consideration for the receipt or expectation of receipt of anything of pecuniary value, *N.J.S.A.* 2C:11–3c(4)(d), and that defendant committed the murder for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant or another, *N.J.S.A.* 2C:11–3c(4)(f). While the court did find one mitigating factor, that defendant rendered substantial assistance to the State in the prosecution of another person for the crime of murder, *N.J.S.A.* 2C:11–3c(5)(g), the court determined that the aggravating factors outweighed beyond a reasonable doubt the mitigating factor. The court sentenced defendant to death.

Defendant contends that there was insufficient evidence to sustain the imposition of the death penalty because his confession lacked independent corroboration of those circumstances

that alone served to establish the aggravating factors. The majority agrees in principle with the defendant's position. *Ante* at 271–278, 571 *A*.2d at 924–927. Nevertheless, the Court remands the case for resentencing because it believes that under the corroboration doctrine, there is evidence in the record of this trial that could satisfy such a standard. *Ante* at 280–281, 571 *A*.2d at 928–929.

I differ from the Court in two major respects. First, I believe that under both constitutional and fundamental-fairness principles, the general requirement of corroboration of a confession should be more strictly applied to a confession in a capital-murder prosecution, particularly as to the aggravating factors. Second, I believe that, under standards governing corroboration, the evidence in this case is insufficient to establish any of the aggravating factors, and hence defendant should be acquitted of the death sentence.

In general, the corroboration rule is held to require either (1) some evidence independent of the confession that corroborates the *corpus delicti*—the particular loss, harm or injury, including some criminal culpability—constituting the crime charged; or (2) some evidence aside from the *corpus delicti* that tends to bolster or strengthen the trustworthiness of the confession itself; or (3) some degree of both. New Jersey, with the majority of states, demands some degree of both. It requires some independent evidence of the *corpus delicti* and some evidence beyond the confession itself that enhances its reliability. *State v. Lucas*, 30 *N.J.* 37, 56, 152 *A*.2d 50 (1959).

As observed by the majority, "[t]he aggravating factors serve not just to measure the length of a sentence, but are regarded as 'essential elements' of capital murder." *Ante* at 270, 571 *A*.2d at 923. Hence, aggravating factors defining capital murder are functionally equivalent to the essential elements of the crime of capital murder, *see State v. Biegenwald, supra*, 106 *N.J.* at 59–60, 524 *A*.2d 130, and, as determined by the Court, must be considered functionally equivalent to the

loss, harm or injury—the *corpus delicti*—that is " 'the substance or foundation of a crime,' " *ante* 270, 571 *A*.2d at 923 (citation omitted). Without aggravating factors, a homicide is not capital murder. Consequently, aggravating factors constituting capital murder are subject to the corroboration rule.

The historical antecedents of the corroboration rule indirectly support the conclusion that aggravating factors defining capital murder should be subject to corroboration. The corroboration doctrine evolved in a setting that demanded the death penalty for murder. The doctrine developed to overcome "notorious instances" in which an individual could be convicted and executed for murder solely on an unsubstantiated confession, when indeed no murder had been committed. *See* 7 J. Wigmore, *Wigmore on Evidence*, § 2070 (Chadbourn rev.1978). In contemporary times there is a parallel: Murder can again exact the death penalty. In the context of current capital-murder prosecutions, the concern is that even though a killing occurred, capital murder may not have been committed.

Additionally, the statutory significance of aggravating factors, as enumerated in *N.J.S.A.* 2C:11–3c, demonstrates that aggravating as well as mitigating factors encompass concerns that range well beyond the basic question of guilt. Such factors implicate the "character and record of the individual offender and the circumstances of the particular offense." *Woodson v. North Carolina*, 428 *U.S.* 280, 304, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976). They address aspects of criminal culpability that may be more complicated than the binary question of guilt or innocence, but must do so to a degree of certainty equivalent to that employed in determining guilt. The existence of aggravating factors must be found beyond a reasonable doubt. *N.J.S.A.* 2C:11–3c(2)(a).

In sum, aggravating factors constitute the essential elements of capital murder. They are proved only by a level of certainty equivalent to that necessary to demonstrate criminal guilt. Hence, when such factors are evidenced solely by a confession,

they cannot be established without adequate corroboration. *See, e.g., People v. Mattson*, 37 *Cal.*3d 85, 94, 207 *Cal.Rptr.* 278, 283, 688 *P.*2d 887, 892 (1984) (pursuant to statutory language, *corpus delicti* of felony-based special circumstances must be proved independently of an accused's extrajudicial statements).

It is not disputed that the singular aspect of defendant's confession that pertains to DiFrisco's arrangement with Franciotti provides the factual basis for the aggravating factors; without these circumstances, the murder is *not* capital murder. Hence, these factors, as has been pointed out, must be regarded and treated as the distinctive loss, harm or injury that uniquely constitutes the *corpus delicti* of capital murder. The critical question, then, is whether defendant's confession to this arrangement—to capital murder—satisfies the doctrine of corroboration.

Confessions are unlike any other type of evidence. The impact they have on a jury is profound.

> Because of the heavy weight which a trier of fact is likely to give to a statement of the defendant, the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained.
>
> [McCormick, *Evidence*, § 148 (2d ed. 1972).]

There remains a genuine danger that our perception of truth will be molded by the existence of a confession alone. Requiring proof of the *corpus delicti* outside the confession minimizes this danger. *See* Note, "Proof of the Corpus Delicti Aliunde the Defendant's Confession," 103 *U.Pa.L.Rev.* 638, 658 (1955) (hereafter, "Note"). This consideration is even more powerful when the corroboration requirement is invoked to determine whether a confession alone can justify the imposition of a death sentence.

In this case, the Court departs from the traditional corroboration rule, which, as noted, entails some degree of both independent evidence of the underlying crime and independent evidence that bolsters the trustworthiness of the confession. *Supra* at

263, 571 *A*.2d at 919. The Court is apparently willing to accept only a scintilla of extrinsic evidence as sufficient to establish the crime—that is, the arrangement to kill—and, indeed, subtly indicates that there need be *no* such evidence if the confession relating to the murder alone is reliable. It says:

> The jury (or judge sitting as jury) may consider the presence or absence of any corroborating proofs offered by the State in determining the existence and weight to be accorded the aggravating factors charged. When there is *no extrinsic corroboration of the aggravating factors themselves*, the jurors must be satisfied beyond a reasonable doubt that the *confession itself* is sufficient to establish the aggravating factors beyond a reasonable doubt.
>
> [*Ante* at 275–276, 571 *A*.2d at 925–926 (emphasis added).]

Applying that reasoning to this case, the Court states:

> The State need not produce independent proof that Franciotti paid DiFrisco but only "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness."
>
> [*Ante* at 273, 571 *A*.2d 925.]

The Court would find the ambiguous circumstances that DiFrisco and Franciotti were both in jail at some unspecified time, without more, sufficient to corroborate independently the rather bizarre arrangement that constitutes the aggravating factors in this case. It says that because "there was a prior relationship between Franciotti and DiFrisco" and "there was a murder as described by DiFrisco," there is, in this case, "sufficient corroboration in law." *Ante* at 275, 571 *A*.2d at 926.

It is evident that the Court understands that its new corroboration rule tolerates only a shred of evidence as sufficient to authenticate what otherwise would unquestionably be a legally insufficient confession. It is not simply wrong for the Court to rule that the vague prior relationship in this case is alone sufficient to corroborate a confession to the contract killing: It is unprincipled. The State itself always viewed with extreme skepticism the significance of that alleged prior connection. Investigators interviewed witnesses and consulted law enforcement agencies "to see if there was a connection, to see if Mr. Franciotti was in the mob, as Mr. DiFrisco said he was, whether there were any organized crime connections," and yet an investigating officer testified that *"we could come up with no*

*connection between the victim, Mr. Franciotti and Mr. Di-Frisco."* *Ante* at 272, 571 *A.*2d at 924 (emphasis added). Further, the State has in no uncertain terms characterized the alleged prior relationship between DiFrisco and Franciotti as wholly inadequate for evidentiary purposes. It took the position that DiFrisco's confession and the so-called "jailhouse link" was not substantial "enough to prove it to a jury beyond a reasonable doubt." *Ante* at 262–263, 571 *A.*2d at 918–919. The Court itself acknowledges that " 'the State did not have sufficient evidence to prove a case against Anthony Franciotti' ..." *ante* at 264, 571 *A.*2d at 920, and that "the State has also determined that the only proof that it has—defendant's confession—*even if repeated in court against Franciotti,* will not be of sufficient probative value to convict Franciotti," *ante* at 268, 571 *A.*2d at 922 (emphasis added). Further, the Court observes that "there is no congruency between defendant's statement and the State's investigative results with respect to the aggravating factors that are essential elements of capital murder...." *Ante* at 280, 571 *A.*2d at 928. It notes that "the State's own investigation of the case has apparently resulted in a conclusion that there is insufficient extrinsic evidence presented of a connection between [DiFrisco and Franciotti] on the date in question to bring the matter before a grand jury," which, the Court finds, stands "in contrast [to] the sentencing court['s determination] beyond a reasonable doubt that defendant acted as a hired gun for Franciotti." *Id.* at 280, 571 *A.*2d at 928.

In dismissive words that do not begin to communicate the enormity of this evidentiary contradiction, the Court says merely: "There is a paradox in the proofs." *Ibid.* The Court, however, goes well beyond this muffled expression of perplexity over a paradox: It permits the State to take the position that the same evidence is wholly insufficient to be credited by a jury as incriminating evidence of crime by an accomplice and yet sufficient as the basis—the sole basis—for executing a person for the commission of that crime. It insults the values inherent

in fundamental fairness and the constitutional protections that assure due process and avert cruel and unusual punishments.

The Court thus sanctions the use of the confession that is corroborated only with respect to the killing to bolster the credibility of the confession to the aggravating factors, in effect, parlaying the confession into sufficient evidence of capital murder. I emphatically disagree with the majority's application of the corroboration rule in this context. Although the Court initially professes that aggravating factors are themselves the *corpus delicti* of capital murder, the level of corroboration it then suggests will suffice to validate a confession to these factors is even less exacting than the corroboration that suffices to establish the underlying crime of knowing or purposeful murder. The majority's application of the corroboration rule effectively relegates these aggravating factors to the level of circumstances that merely increase the degree of a crime. *See* Note, *supra,* at 654–55.

It should be noted that the Court does not acknowledge that its corroboration rule is a new formulation of the doctrine. That is extremely unfortunate because the new rule lowers the level of proof sufficient to validate a confession. The Court has thus seen fit in this critical application of our standards of criminal justice to weaken, rather than to strengthen, the procedural and substantive protections that surround a defendant charged with capital murder. Moreover, the Court does not envisage that its current rule is applicable only to the use of a confession in a capital-murder prosecution. "The confession here does not make this case different." *Ante* at 274, 571 *A.*2d at 925. Its rule is one of general applicability in the administration of criminal justice. This is both perplexing and ironic because the corroboration rule the Court now adopts thus not only fails to give defendants in capital cases the heightened protections demanded by our Constitution. It actually erodes the protective standards that are applicable generally in the prosecution of criminal cases.

Finally, I agree with the majority that in-court confessions should require corroboration to the same extent as extra-judicial confessions. *Ante* at 278, 571 *A*.2d at 927. There are major reasons that call for corroboration, particularly the important policy of encouraging comprehensive policework. This particular policy consideration is especially potent in this case, in which, as explained by the Court, *ante* at 267–269, 571 *A*.2d at 922, there appears to be questionable policework concerning any investigative pursuit of Franciotti. A corroboration rule that suffers or condones such dubious law enforcement conduct should not be encouraged.

These considerations would be equally germane with respect to in- or out-of-court confessions. Arguably, an in-court confession may generate an aura of truthfulness that may not surround an extra-judicial confession. *See, e.g.,* 7 J. Wigmore, *supra,* § 2071 at 524 ("as to the application of the rule, it remains only to note that it has of course no bearing upon an infra judicial confession, which is in effect a plea of guilty."); *Manning v. United States,* 215 *F.*2d 945 (10th Cir.1954). Still, a confession in testimonial form, not otherwise corroborated, should not be more readily accepted. This is so particularly when the absence of corroboration reflects inadequate police work and suggests prosecutorial dissembling and nonaccountability; and, more significantly, it implicates the most important aspect of criminal guilt, that which bears directly on the imposition of society's most extreme sanction—the death penalty. In an ordinary criminal prosecution, perhaps, the absence of corroboration of an in-court confession may not always be critical. Nevertheless, in the context of capital-murder prosecutions, adequate corroboration should be a constant concern and must, as a matter of fundamental fairness, be a precondition to the evidential use of a confession whether or not obtained in testimonial form in court.

We have repeatedly adhered to the principle of stricter procedures of capital-murder prosecutions. "In the. context of the death penalty, where the demands for fairness and accuracy

are heightened, the principles of consistency and reliability rise to constitutional dimension." *State v. Ramseur*, 106 *N.J.* 123, 190, 524 *A*.2d 188 (1987). Where the words of the defendant are used to sustain death, *more* rather than less corroborating evidence must be required in order to justify the imposition of death as a sentence for the crime.

Accordingly, I would vacate the death penalty on grounds of insufficient evidence of the aggravating factors.

### III.

The vice of using an uncorroborated confession that renders a homicide capital murder has been prejudicially exacerbated in this case. The uncorroborated circumstances that constitute the sole factual basis for the aggravating factors have not only been improperly admitted into evidence, but they have also, in effect, been double-counted. This issue, though not raised, cannot be ignored.

The danger of double-counting is present when several aggravating factors refer to the same aspect of a defendant's crime. *See, e.g., Bey (II), supra*, 112 *N.J.* at 176, 548 *A*.2d 887 (identifying jurisdictions that do not permit simultaneous presentation of the aggravating factors that murder was committed for pecuniary gain and that murder occurred during the course of a robbery). I believe that the rationality of capital sentences is undermined by the risk that allegedly distinct aggravating factors are based on identical evidence. *See State v. Ramseur, supra*, 106 *N.J.* at 392 n. 21, 524 *A*.2d 188 (Handler, J., dissenting); *State v. Bey (II), supra*, 112 *N.J.* at 221–22, 548 *A*.2d 887 (Handler, J., dissenting). The Court has acknowledged that "jury consideration of two aggravating factors based on identical evidence enhances the likelihood of arbitrary imposition of the death sentence." *State v. Rose*, 112 *N.J.* 454, 525, 548 *A*.2d 1058 (1988).

In the case *sub judice*, the trial court found both c(4)(d) and c(4)(f), and further found that they outweighed the sole mitigat-

ing factor, c(5)(g). Both these aggravating factors, *i.e.*, killing for pay and to avoid detection, clearly overlap. The trial court's finding means not only that did Franciotti pay defendant to commit the murder, but that Franciotti did so to avoid detection. It thus appears that the purposes for this murder are so intertwined as to be incident to each other.

In *Rose*, the alleged overlap was between aggravating factor c(4)(f) (murder to escape detection) and c(4)(h) (murder of public servant), even though the former related to the defendant's motive, and the latter to the status of the victim. 112 *N.J.* at 454, 548 *A.*2d 1058. The jury in *Rose* was allowed to find that the murder was aggravated both because defendant murdered to escape detection and because he murdered the person whose duty it was to detect him. At least the evidence in *Rose* related to separate phenomena, motive and conduct. In this case, the overlap of the aggravating factors is even more pronounced because each aggravating factor related only to defendant's motive. Defendant provided essentially the same basis for supporting either of these aggravating factors; although he spoke of receiving money for the murder, he simultaneously stated that he murdered as a "favor" for a man that he "kind of looked up to" and did not want to "see ... go to prison."

The aggravating factor scheme under our current statutory structure does not reasonably accommodate this situation, in which defendant's motives are clearly indissolubly mixed. Justice Robertson addressed this schematic shortcoming in *Wiley v. State*, 484 *So.*2d 339 (Miss.), *cert. den.*, 479 *U.S.* 906, 107 *S.Ct.* 304, 93 *L.Ed.*2d 278, *reh'g den.*, 479 *U.S.* 999, 107 *S.Ct.* 604, 93 *L.Ed.*2d 604 (1986). He made the trenchant observation that "[i]n the end, the fallacy of our rule is its failure to recognize that murders are aggravated by a defendant's conduct, not by statutory language.... *A single legally indivisible act of the defendant may rationally aggravate a murder but once.*" *Id.* at 358 (Robertson, J., concurring) (emphasis in original). The submission of separate and discrete factors implies that each factor that is found legitimately can escalate

the degree of criminal severity and culpability. The inescapable consequence of allowing the sentencing body to extrapolate two factors from one lump of evidence is to inflate artificially the evidence that is the basis for such factors.[2] In this case, the single evidentiary basis for the aggravating factors is that Franciotti sought to escape detection by paying defendant to murder the victim. One simply cannot parse the reason or motive for defendant's conduct to aggravate the murder twice. The defendant acted the way he did precisely because Franciotti wanted to escape detection. The distinction between motives is simply too attenuated in the circumstances of this case to allow the accumulation of both aggravating factors.

Moreover, the record itself suggests that there was double-counting. In considering whether the murder in this case satisfied aggravating factor c(4)(c) because it was done as an "execution," the court concluded that this was really only an aspect of aggravating factor c(4)(d), murder for hire. The trial court explained:

> I find beyond a reasonable doubt that the following aggravating factors exist: That Mr. DiFrisco killed for money at the request of another. Two. That Mr. DiFrisco committed the murder so that Potcher would not, in the defendant's words, would not rat on Anthony Franciotti and his associates. I do not find the existence of the aggravating factor listed as number one in the "Notice of Aggravating Factors" because that is encompassed in the commission of the murder for a consideration.

It defies reason, logic and fairness to conclude that the execution of the victim "is encompassed in the commission of murder for a consideration" but that the murder to enable Franciotti to escape detection is not. Indeed, the latter seems even more deeply embedded in defendant's blurred motivation.

Further, the weight accorded to the aggravating factors may have been otherwise distorted. Aggravating factor c(4)(c) is

---

[2] It should be noted that "no one doubts that the side with the largest number of 'circumstances' has a practical advantage before the sentencing jury." *State v. Wiley, supra,* 484 *So.*2d at 357 (Robertson, J., concurring).

clearly inapplicable in defendant's case,[3] though not for the reasons stated by the trial court. Nevertheless, the trial court believed that the evidence relating to c(4)(c), the "execution" of the victim, was encompassed in the aggravating factor of c(4)(d). Hence, the inference that the incorporation of c(4)(c) into c(4)(d) served to increase the weight accorded to (c)(4)(d) cannot be dispelled.

The Court has acknowledged the potential for prejudice in such overlapping factors based merely on the same evidence, but has determined that this can be cured by a limiting instruction to the jury that will "prevent it from giving undue weight to the number of factors...." *Bey (II), supra,* 112 *N.J.* at 176, 548 *A.*2d 887. The jury must "not assign inordinate weight to the facts that support multiple factors." *Rose, supra,* 112 *N.J.* at 527, 548 *A.*2d 1058. I remain of the view that this standard is illusory and totally ineffective to prevent the artificial exaggeration of the legal significance of underlying evidence.[4]

---

[3] Under this Court's opinion in *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987), an opinion available to the trial court at the time of defendant's trial, it is clear that defendant's actions were not depraved in the statutory sense of the word, and there is no evidence that defendant *"intend[ed]* to inflict pain, harm, and suffering—in addition to intending death." *Id.* at 208, 524 *A.*2d 188 (emphasis in original). Comparison of the facts of the case *sub judice* and those in *Rose* further compels this conclusion. In *Rose,* the Court noted that:

> Aside from evidence that defendant has fired the shotgun and was knowledgeable about its capacity to inflict devastating injury, there was no proof that defendant's intention was to cause Officer Garaffa to endure pain and suffering, rather than to kill him. Although the State argues that a shotgun fired at the abdomen, rather than at a more vital organ, is likely to result in pain and suffering prior to death, this fact alone cannot be sufficient to prove defendant's intention to inflict severe pain and suffering prior to death.
>
> [*Rose, supra,* 112 *N.J.* at 531, 548 *A.*2d 1058.]

However, in this case the evidence indicates only that defendant intended to kill quickly.

[4] I observed in *Rose:*

> Try to imagine the effect of this instruction from the perspective of a rational juror. This juror will be instructed that he or she will be conducting a weighing process, in which the jury will be asked to enumer-

Nevertheless, in this case, there was no jury and, obviously, no such limiting instructions. Thus, it is virtually impossible to determine how the trial court, lacking the standards established by this Court in *Bey II* and *Rose*, dealt with this problem.

These are additional, convincing reasons that require the reversal of defendant's death sentence.

## IV.

A final concern raised by this appeal but not directly confronted by the Court is the disproportionality of the death penalty evidenced by the failure of the State to prosecute Franciotti. The failure to prosecute Franciotti, or even to explain this failure, exemplifies the flaw that is inherent in the current implementation of the State's capital-murder statute, the absence of uniform standards to provide guided prosecutorial discretion in the prosecution of capital-murder defendants.

This serious deficiency in the statute is not a recent discovery. It has been noted and memorialized by the Court consistently throughout its decisions. *E.g., State v. Ramseur, supra,* 106 *N.J.* at 329, 524 *A.*2d 188 (1987); *State v. Koedatich,* 112 *N.J.* 225, 250–58, 548 *A.*2d 939 (1988). The absence of

---

ate certain aspects of the crime deemed by the legislature to "aggravate" it; the inevitable implication of this task is that the degree of aggravation of the crime increases with the number of these presumably separate circumstances that are found to exist. This implication is undermined where the aggravating element underlying two factors is identical. The Court recognizes this, so the juror will now be instructed, in essence: "Look. We want you to be aware that even though these two circumstances may exist, you have considered the same facts twice. You are allowed to do this, but we want you to know that you are doing it. Do not give those factors undue weight." A rational juror, confronted with this charge, may well wonder what is meant by "undue weight." Does undue weight consist in giving the second factor any weight at all? Giving both full weight? Giving both three-quarters the weight each would have if considered alone? Giving one full weight and the other half? Does not the fact that there are two circumstances rather than one increase the degree of aggravation? [*Rose, supra,* 112 *N.J.* at 575–76, 548 *A.*2d 1058.]

guided prosecutorial discretion was implicit in *State v. Matu-lewicz*, 115 *N.J.* 191, 557 *A.*2d 1001 (1989). I observed in that case that the standard devised by the Court in connection with the prosecutor's selection of aggravating factors failed "to check the virtually unlimited discretion afforded prosecutors in choosing to charge a defendant with capital murder." 115 *N.J.* at 206, 557 *A.*2d 1001 (Handler, J., concurring). I stressed:

> The virtually unfettered power of prosecutors to select who is to be prosecuted for capital murder further exacerbates the risk of arbitrary enforcement of the death penalty and creates a major flaw in this statutory scheme.
> [115 *N.J.* at 207, 557 *A.*2d 1001 (Handler, J., concurring) (citations omitted).]

No one disputes for a moment that there is little to separate Franciotti from DiFricso in terms of culpability. Our capital-murder statute does not distinguish between the two in terms of culpability. There are some who would find the "hit man" in a for-hire murder more reprehensible than the contractor; others might consider the one who pays for the killing the more revolting.

In the relatively brief history of our current death-penalty law there have been capital prosecutions of defendants on both sides of a contract killing. *See, e.g.*, Bienen, Weiner, Denno, Allison & Mills, "The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion," 41 *Rutgers L. Rev.* 27 (1988) (Public Defender's Preliminary Report discussed by the Court in *State v. Koedatich, supra*, 112 *N.J.* at 256, 548 *A.*2d 939) [hereinafter "Reimposition"]. The relatively scant data compiled so far suggest that there is inconsistency and disparity in the capital-murder statute's treatment of defendants charged with these aggravating factors. "Reimposition," *supra*, 41 *Rutgers L. Rev.* at 251–52, 263–83 (Tables 34–50). The absence of guided prosecutorial discretion in this case exemplified by the unexplained failure to prosecute Franciotti is another glaring example of arbitrariness and disproportionality.

These concerns are not whimsical or theoretical. During the penalty phase of the trial, the trial court itself expressed grave misgivings over the State's failure to prosecute Franciotti. The

prosecutor stated that consideration of Franciotti was "not part of this case." Prior to summation by the State at the penalty phase, the trial court interjected the following remarks:

> Of course, I cannot tell you what your summation should contain, just as I cannot direct the Prosecutor's Office to present a matter to the Grand Jury. I recognize that there is a separation of powers, a constitutional separation of powers between the duties of the executive and the judiciary and the legislature. I am fully mindful, so I am not going to do it. But I am sure you anticipate the question that perplexes me. And when I say you, Mr. Bogdanski, I don't mean Mr. Bogdanski but I mean the Essex County Prosecutor's Office. The Essex County Prosecutor's Office presented the defendants' voluntary confession to the Grand Jury and thereby procured an indictment and thereafter the Prosecutor's office filed aggravating factors asking for the imposition of capital punishment. Your witnesses, Officers Kukk, Saunders and Kennedy, have all testified that they believe Mr. DiFrisco's confession. Whoever made the decision to prosecute must have believed it. And indeed whoever decided to file the aggravating factors which result in capital punishment must have believed it.
>
> The Grand Jury found probable cause.
>
> If your office can ask for the imposition of the death penalty based upon the truthfulness of defendant's statements, isn't it an exercise in cynicism, in absolute cynicism, sir, not to present that evidence in which the belief is so strong and abiding to a Grand Jury so that the Franciottis of this world will not be free to go around in society hatching the evil plans for the killings of others and allowing them to go untried?
>
> And although this may not make any difference in my considerations, and this is by no means a reflection of what this Court intends to do, would not the imposition of the death penalty weaken this case or the case against Franciotti? What should anybody who is sentenced to death even bother to testify?
>
> And I realize that there is no reason why the Court should not do its duty simply because it believes that someone else is less than zealous in the performance of their's.

This Court's professed general concern about the impact of unguided prosecutorial discretion and proportionality in the imposition of the death sentence is alarmingly understated in this case. Referring to the prosecutorial decision to obtain the death penalty against DiFrisco and to leave Franciotti untouched, the Court observes diffidently that "we may surmise that not all is known about this case," *ante* at 269, 571 A.2d at 922. The failure to prosecute Franciotti, or even to explain

this failure, suggests the arbitrary and capricious nature of the prosecutor's decision to prosecute DiFrisco.

I reiterate a comment made in *Matulewicz:*

> Even more problematic ... is the absence of uniform statewide standards to guide prosecutors in making such a momentous determination. Without such uniform standards to guide the selection process, the arbitrary enforcement of the death penalty is inevitable because the very pool of people selected to endure a capital trial at the initial stage of the prosecution is an arbitrarily-composed lot, reflecting determinations by individual prosecutors that may be conscientious but are nonetheless often highly subjective and speculative.
>
> [115 *N.J.* at 207–08, 557 *A.*2d 1001 (Handler, J., concurring) (citation omitted).]

It is disturbing that the Court is willing to condone the continued absence of uniform standards to judge prosecutorial decisions to prosecute a homicide as capital murder and to accept on remand the prosecutor's *ex post facto* explanation of the reasons that prompted his decision to leave Franciotti alone. The prosecutor's explanation, we know already, is unfocused and implausible. The prosecutor maintained that DiFrisco refused to cooperate and "stonewalled" the investigation of Franciotti and, further, that DiFrisco's Franciotti story is unbelievable. The trial court eviscerated the prosecutor's explanation: it found that defendant rendered substantial assistance to the State in the prosecution of another person for the crime of murder sufficient to constitute a mitigating factor under c(5)(g), and that DiFrisco's version of events is believable—indeed, is so convincing that he deserves to die.

In the current posture of this case, defendant's prosecution for capital murder and his death sentence constitute an intolerable example of disproportionality engendered by the absence of guided prosecutorial discretion and, I add, prosecutorial accountability.

## V.

For the reasons stated herein, and my belief that the capital-murder statute is invalid, I would vacate defendant's guilty plea, reverse defendant's conviction for murder, and reverse the death sentence.

HANDLER, J., concurring in part and dissenting in part.

*For affirmance in part, reversal in part and remandment* —Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.